Ronald Nichols
NAME
D-27314
PRISON NUMBER

A.S.P. 530-2-05L  P.O. Box 9
CURRENT ADDRESS OR PLACE OF CONFINEMEN

Avenal, CA  93204
CITY, STATE, ZIP CODE



FILED
JUL 10 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ronald Nichols                                ,
(FULL NAME OF PETITIONER)

**PETITIONER**

v.

James Hartley, Warden, et al,
(NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED
PERSON HAVING CUSTODY OF PETITIONER [E.G., DIRECTOR OF THE
CALIFORNIA DEPARTMENT OF CORRECTIONS])

**RESPONDENT**
and

Edmund G. Brown, Jr.              ,
The Attorney General of the State of
California, Additional Respondent.

Civil No **'08 CV 1241 DMS RBB**
(TO BE FILLED IN BY CLERK OF U.S. DISTRICT COURT)

**PETITION FOR WRIT OF HABEAS CORPUS**

UNDER 28 U.S.C. § 2254
BY A PERSON IN STATE CUSTODY

1. Name and location of the court that entered the judgment of conviction under attack:
   San Diego Superior Court

2. Date of judgment of conviction: February 14, 1986

3. Trial court case number of the judgment of conviction being challenged: SDCR 75164

4. Length of sentence: 15 years to life plus one year weapon enhancement

CIV 68 (Rev. Jan. 2006)                                                    CV

5. Sentence start date and projected release date: April 7, 1986 /MEPD: 11/23/95

6. Offense(s) for which you were convicted or pleaded guilty (all counts):

Second degree Murder / use of weapon (Knife)

7. What was your plea? (CHECK ONE)

(a) Not guilty   ☒
(b) Guilty   ☐
(c) Nolo contendere   ☐

8. If you pleaded not guilty, what kind of trial did you have? (CHECK ONE)

(a) Jury   ☒
(b) Judge only   ☐

9. Did you testify at the trial?

☒ Yes   ☐ No

## DIRECT APPEAL

10. Did you appeal from the judgment of conviction in the **California Court of Appeal**?

☒ Yes   ☐ No

11. If you appealed in the **California Court of Appeal**, answer the following:

(a) Result: Denied

(b) Date of result (if known):   Unknown

(c) Case number and citation (if known):   Unknown
(d) Names of Judges participating in case (if known):   unknown

(e) Grounds raised on direct appeal:   Unknown

12. If you sought further direct review of the decision on appeal by the **California Supreme Court** (e.g., a Petition for Review), please answer the following:

(a) Result:

(b) Date of result (if known):

(c) Case number and citation (if known):

(d) Grounds raised:

CIV 68 (Rev. Jan. 2006)

cv

**13.** If you filed a petition for certiorari in the **United States Supreme Court**, please answer the following with respect to that petition:

    (a) Result:

    (b) Date of result (if known):

    (c) Case number and citation (if known):

    (d) Grounds raised:

## COLLATERAL REVIEW IN STATE COURT

**14.** Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Superior Court**?
    ☒ Yes ☐ No

**15.** If your answer to #14 was "Yes," give the following information:

    (a) **California Superior Court** Case Number (if known): HC 17957

    (b) Nature of proceeding:
       Habeas Corpus

    (c) Grounds raised: The Board of Parole Hearing's denial of Earned Postconviction Credits violates the Due Process Clause of the Fourteenth Amendment

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
       ☐ Yes ☒ No

    (e) Result: Denied

    (f) Date of result (if known): January 16, 2008

**16.** Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Court of Appeal**?
    ☒ Yes ☐ No

17. If your answer to #16 was "Yes," give the following information:

    (a) **California Court of Appeal** Case Number (if known): D052412

    (b) Nature of proceeding: Habeas Corpus

    (c) Names of Judges participating in case (if known)
       Huffman, Haller, and McIntyre

    (d) Grounds raised: The Board of Parole Hearing's Denial of earned postconviction credits violates the Due Process Clause of the Fourteenth Amendment.

    (e) Did you receive an evidentiary hearing on your petition, application or motion?
      ☐ Yes ☒ No

    (f) Result: Denied

    (g) Date of result (if known): May 8, 2008

18. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions (e.g., a Petition for Writ of Habeas Corpus) with respect to this judgment in the **California Supreme Court**?
☒ Yes ☐ No

19. If your answer to #18 was "Yes," give the following information:

    (a) **California Supreme Court** Case Number (if known): S163676

    (b) Nature of proceeding: Petition for Review

    (c) Grounds raised: The Board: 1) violated Petitioner's Protected Liberty Interest and Due Process by denial of earned credits; 2) That Petitioner poses an unreasonable risk of danger or threat to public safety is unsupported by any evidence; 3) Reliance on the commitment offense violates Petitioner's Due Process; 4) Petitioner has been held in custody for a period grossly disporportionate to the commitment offense.

    (d) Did you receive an evidentiary hearing on your petition, application or motion?
      ☐ Yes ☒ No

    (e) Result: Denied

    (f) Date of result (if known): June 25, 2008

CIV 68 (Rev. Jan. 2006)

.cv

20. If you did *not* file a petition, application or motion (e.g., a Petition for Review or a Petition for Writ of Habeas Corpus) with the **California Supreme Court**, containing the grounds raised in this federal Petition, explain briefly why you did not:

## COLLATERAL REVIEW IN FEDERAL COURT

21. Is this your **first** federal petition for writ of habeas corpus challenging this conviction?
    ☒Yes ☐ No      (IF "YES" SKIP TO #22)
    (a) If no, in what federal court was the prior action filed?
    (i) What was the prior case number?
    (ii) Was the prior action (CHECK ONE):
           · Denied on the merits?        ☐
           Dismissed for procedural reasons?  ☐
    (iii) Date of decision:
    (b) Were any of the issues in this current petition also raised in the prior federal petition?
        ☐Yes ☐No
    (c) If the prior case was denied on the merits, has the Ninth Circuit Court of Appeals given you permission to file this second or successive petition?
        ☐Yes ☐No

---

CAUTION:

- **Exhaustion of State Court Remedies:** In order to proceed in federal court you must ordinarily first exhaust your state court remedies as to each ground on which you request action by the federal court. This means that even if you have exhausted some grounds by raising them before the California Supreme Court, you must first present *all* other grounds to the California Supreme Court before raising them in your federal Petition.

- **Single Petition:** If you fail to set forth all grounds in this Petition challenging a specific judgment, you may be barred from presenting additional grounds challenging the same judgment at a later date.

- **Factual Specificity:** You must state facts, not conclusions, in support of your grounds. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do. A rule of thumb to follow is — state who did exactly what to violate your federal constitutional rights at what time or place.

---

## GROUNDS FOR RELIEF

22. **State** *concisely* **every ground on which you claim that you are being held in violation of the constitution, law or treaties of the United States.  Summarize** *briefly* **the facts supporting each ground.** (e.g. what happened during the state proceedings that you contend resulted in a violation of the constitution, law or treaties of the United States.)  If necessary, you may attach pages stating additional grounds and/or facts supporting each ground.

(a) **GROUND ONE**: The Board of Parole Hearing's policy and procedures to deny earned postconviction credits violates the Protected Liberty Interest and Due Process Clause of the Fourteenth Amendment.

**Supporting FACTS:**  On May 15, 1985, Petitioner, Ronald Nichols, murdered his best friend, Scott Lewis Tucker, with a knife, after three months of considerable stress upon Petitioner which built to a rage.  The victim, Mr. Tucker, was having an affair with Petitioner's girlfriend.  Petitioner was out on bail during the jury trial.

On February 14, 1986, the San Diego Superior Court, after jury trial, sentenced Petitioner to a term of 15 years to life, pursuant to Penal Code Section 187, and an additional one (1) year enhancement for use of a weapon (knife), pursuant to Penal Code Section 12022(b).

Petitioner was received by the Department of Corrections on April 7, 1986.  The Department set his

**Did you raise GROUND ONE in the California Supreme Court?**

X Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review

(2) Case number or citation: S163676

(3) Result (attach a copy of the court's opinion or order if available): Denied

CIV 68 (Rev. Jan. 2006)

cv

Minimum Eligible Parole Date at November 23, 1995.

On November 1, 1994, at Petitioner's Initial Parole Consideration Hearing, the Board denied parole for two (2) years. In 1996, Petitioner stipulated to a one (1) year denial in order to comply with the Board's recommendation to complete Vocational X-Ray. On October 28, 1997, at Petitioner's first Subsequent Parole Consideration Hearing, the Board denied parole for four (4) years. On January 15, 2002, at Petitioner's second Subsequent Parole Consideration Hearing, the Board denied parole for two (2) years. On May 4, 2004, at Petitioner's third Subsequent Parole Consideration Hearing, the Board denied parole for two (2) years. On August 15, 2006, at Petitioner's fourth (4th) Subsequent Parole Consideration Hearing, the Board denied parole for five (5) years.

Petitioner comes before this Court challenging the Board's August 15, 2006 decision for the following reasons:

Petitioner contends that the California Board of Parole Hearings forebearance in timely fixing a definite term of confinement and applying Petitioner's earned postconviction credits to reduce that term before it has expired, has effectively denied Petitioner his Liberty Interest in his postconviction credit in violation of the United States Constitution Fourteenth Amendment.

Before Petitioner can be denied his postconviction credit, he is entitled to the minimum procedural due process provisions outlined by the United States Supreme Court in Wolff v. McDonnell, 418 U.S. 539 (1974), and Superintendent v. Hill, 472, U.S. 445 (1985).

The Board of Parole Hearings has failed to provide the mandatory minimum due process before effectively denying Petitioner his earned postconviction (goodtime/worktime) credits, automatically

6-A

placing Petitioner in a "non-credit earning" status.

A. **Petitioner's Current Credit Status**

Petitioner began serving his "15 year-to-life" term on April 7, 1986, and as of August 15, 2006 (the date of Petitioner's last Parole Consideration Hearing), he has served 20 years, 4 months, and 8 days (7,436 days) in actual custody towards his term. Petitioner earned approximately 2,478 days of postconviction credit toward the service of his term, specifically provided to reduce his time in confinement, and has accrued a total of 99 days Pre Prison credits (60 days actual time, 30 days credit, and 9 days Post Sentence). Thus, Petitioner has accrued a total of approximately 10,013 days (time in custody, earned postconviction credit, and Pre Prison credit) towards his term and/or time in confinement.

B. **Petitioner's Probable Term of Confinement**

The base term for Petitioner's offense (second degree murder) is limited from a minimum term of 15 years, to a maximum term of 21 years as mandated by California Code of Regulations, Title 15, Division 2, §2403, subdivision (b).   The circumstances and/or "gravity" of Petitioner's commitment offense places him squarely into Category C-II of the second degree murder "Matrix" (Cal. Code Regs., tit. 15 §2403(a)), with a middle base term of 19 years (approximately 6,935 days).

C. **Doing The Math**

Now that Petitioner's accrued days of constructive confinement (10,013 days as of August 15, 2006) have been defined, and his probable base term of confinement identified, the math becomes simple.

When you take the "base term" of 6,935 days, minus the 10,013 days of accrued time/credit toward the service of his term,

Petitioner has served 3,078 days (as of August 15, 2006) and counting, beyond the expiration of his time in confinement. The Board cannot, from this point forward, calculate a "release date" in this case that has not already past.

The Boards failure and/or forebearance in timely fixing Petitioner's "base term" and applying his earned postconviction credits to reduce his time in confinement, has effectively denied him his earned, statutorily mandated credits. The denial of these post-conviction credits has now resulted in Petitioner's insarceration beyond his earned release date, which is the only "release date" the Board can lawfully muster. In failing to apply Petitioner's earned "credits" to some definite period of confinement, before that definite period of confinement has elapsed, has effectively denied those credits and has, and continues to hold Petitioner in custody in violation of State and Federal Constitutional provisions providing Due Process before depriving a prisoner of his "liberty interest."

The ultimate question before the Court is whether the denial of Petitioner's earned postconviction credit violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

D.    Standard of Review

The United States Supreme Court has clearly established that the standard of review for the denial of goodtime (post-conviction) credit is the "some evidence" standard of review. Superintendent v. Hill, 472 U.S. 445, 446 ("Assuming that goodtime credits constitute a protected liberty interest, the revocation of such credits must be supported by some evidence in order to

6-C

satisfy the minimum requirements of procedural due process.").

E.    Petitioner's Liberty Interest in Postconviction Credits

The United States Supreme Court has also clearly established that postconviction credit constitutes a protected liberty interest. Wolff v. McDonnell, 418 U.S. 539, 557 (1974) ("But the state having created the right to goodtime and itself recognized that it's deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state created right is not arbitrarily abrogated."); Hill, supra, 472 U.S. at 454 ("where a prisoner has a liberty interest in good time credits, the loss of such credit threatens his prospective freedom from confinement by extending the length of imprisonment. Thus the inmate has a strong interest in assuring that the loss of good time credit is not imposed arbitrarily. (Citation).")

The State of California, having created the right to earn postconviction credit, and also creating that the deprivation of earned credit can only be for serious misconduct in conjunction with specific due process procedures, provides Petitioner with the "liberty interest" protectable under the Fourteenth Amendment to the U.S. Constitution.

F.    Authority for Earning "Goodtime/Worktime" (Postconviction) Credits

1) Penal Code Section 190 (a) ... "Article 2.5 (commencing with section 2930) of chapter 7 of title 1 of part 3 shall apply to

6-D

reduce any minimum term of 15 or 25 years in the state prison imposed pursuant to this section, but the person shall not otherwise be released on parole prior to that time."

California Penal Statutes and Regulations specifically define and mandate the various "credits" to prisoner's to reduce their time in confinement. Petitioner receives credit for his time in prison (Cal. Pen. Code §2900, subd., (c)); has earned credit to reduce his minimum eligible parole date (Cal. Pen. Code §190, subd., (a), §2931, subd., (a), (b) and (c); and he continues to earn "post-conviction" (goodtime/worktime) credits for good conduct and participation in work, education, vocational, theraputic or other prison activities (Cal. Pen. Code §2933, subd., (e), §2931, subd., (a), (b) and (c); Cal. Code Regs., tit. 15, §2410).

G.   **Potential for Loss of Earned Credit**

California Penal Statutes and Regulations also specifically define the circumstances and procedural due process in which a prisoner may loose earned credits. (Cal. Pen. Code §2932; Cal. Code Regs., tit. 15, §3043.2, §3043.3 and §3323).

California Code of Regulations, Title 15, Div. 3, §3043.4 states : "An inmate eligible to earn worktime credit who refuses a full-time qualifying assignment, or is placed on non-credit earning status (work group C) by a classification committee for frequent work/training violations, shall not receive a worktime credit reduction from their sentence until the inmate agrees to accept a qualifying assignment."

The Board claims it does not have to apply postconviction (goodtime/worktime) credits until an inmate is found suitable for parole. However, it is clear that **all** inmates can be assessed

6-E

a loss off goodtime/worktime credit for rule violations or infractions. This even applies to Indeterminate "Life" prisoners who have not yet been found suitable for parole by the Board.

It only stands to reason then, that if an Indeterminate "Life" prisoner can loose goodtime/worktime credits for a rules violation, even if he has not been found suitable for parole by the Board, then he also must be able to earn postconviction (goodtime/worktime credits even if he has yet to be found suitable for parole. Simply put, goodtime/worktime credits are a gate that swings both ways. Any inmate may earn, or loose, goodtime/worktime credits based upon their performance while in prison, even those inmates not yet found suitable for parole.

### H.   Continued Incarceration After Expiration of Term

The main problem with California's parole scheme, is that it has somehow become infected to allow the Board of Parole Hearings to procrastinate in calculating a prisoner's lawful "release date" until that date has long past, and he has been denied his earned credit which reduced that term of confinement, without any due process for the denial of his earned credit. In fact, many State and Federal courts have begun to recognize that California prisoners are being held in custody after the "expiration" of the terms to which they were entitled to release, and beyond the lawfully calculated "release dates" as determined by the Board. (See, eg., McQuillion v. Duncan, 342 F. 3d 1012, 1015 (9th Cir. 2003) (stating that if McQuillion was "released on the date to which he was entitled, he would have been released in May of 1994. The three-year parole, to which he would have been required to serve if he had been released on time, has long since expired."); Martin v. Marshall, 431 F. Supp. 2d 1038, 1047

6 - F

(recognizing that Petitioner has "exceeded his sentence by approx. six years" when granting habeas relief); Martin v. Marshall, 2006 U.S. Dist. LEXIS 49990 (on application for modification of judgement, the court granted habeas relief by deducting the "surplus time he had served in confinement from his parole period.); Rosenkrantz v. Marshall, 444 F. Supp. 2d 1063 (recognizing that his release date had twice been set under California law and both of these dates "have long since past."); In re Scott, 133 Cal. App. 4th 573, 579-87 (1st Dist., 2005) (total period of confinement set at 13 years, 6 months, after prisoner served 18 years; Board told prisoner, "you are past your release date."); In re Earnest Smith, 2007 DJDAR 6217 (6th Dist., 2007) (determining that Smith had served 32.75 of constructive confinement against a term of 20 years when deducting the excess period of confinement from his parole period; The court stated that "Smith's total credits exceed his base term of imprisonment by 12.75 years, which is another way of stating, as we have already done, that his sentence was 20 years be he contructively served 32.75 years."); Blankenship v. Kane, slip copy, 2007 WL 1113798 (N.D. Cal.) ("Here, petitioner had served approximately twenty years at the time of the parole hearing in question, and has now served twenty-four. His sentence included a fifteen-year minimum term and the Board found that petitioners uniform term was only seventeen years."; Thomas v. Brown, slip copy, 2006 WL 3783555 at *11 (N.D. Cal.) ("once the BPT determined that Thomas was suitable for parole, it calculated his term and assessed a total term of confinement of 228 months, less postconviction credits of 83 months, for a total period of confinement of 12.1 years, and that Thomas was already past his release date."); McCullough v. Kane, 2007 WL

6 - G

1593227 (once the BPH determined that McCullough was suitable for parole, it calculated his term and assessed a total term of confinement of 258 months, less postconviction credits of 75 months, for a total period of confinement of 183 months (15.25 years)...and he is past his release date, after he already served 24 years).)

The California Legislature has also recognized and compiled statistics that show that "the few indeterminately sentenced inmates who are released have served an average of 17.72 years, or 6.3 years past their earned release dates." (Exhibit C, p. 54) Most important, however, is the Boards own calculations when the finally do set a prisoner's "base term" and actually calculate his release date, that date is long in the past and certainly of no tangible benefit, and absolutely unconstitutional as all the earned credit has effectively been denied. (Exhibit D, pp 58-62). As can be seen from Exhibit D, pp 58-62, the release dates calculated by the Board have past from 4 to 11 years from the date the Board finally did the calculation.

## Conclusion

The Board of Parole Hearings has unlawfully circumvented Petitioner's liberty interest in his earned postconviction credits in violation of the U.S. Constitution. Accordingly, the Board must be ordered to fix Petitioner's base term of confinement and apply his earned postconviction credit to calculate his "release date." If that release date has past, he must immediately be released from custody and any excess period of confinement must be deducted from his statutory period of parole.

6 - H

**(b) GROUND TWO:** The Board's conclusion that Petitioner would pose an unreasonable risk of danger to society or threat to public safety if released from prison is unsupported by any evidence in the record.

**Supporting FACTS:** The Board of Parole Hearing's based its decision that Petitioner would pose an unreasonable risk of danger to society or a threat to public safety if released from prison based upon 1) the crime; 2) the psychological report; 3) Petitioner's detachment from the crime; 4) the need for more therapy, are unsupported by any evidence in the record.

### Standard of Review

The California Supreme Court has addressed the judicial review standard that applies to parole decisions by the Board in In re Rosenkrantz (2002) 29 Cal. 4th 616. The Supreme Court held that "the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but in conducting such a review, the court may inquire only to whether some evidence in the record before the Board supports the decision to

**Did you raise GROUND TWO in the California Supreme Court?**

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review

(2) Case number or citation: S163676

(3) Result (attach a copy of the court's opinion or order if available): Denied

deny parole, based on the factors specified by statute and regulation. If the decision's consideration of the specified factors is not support by some evidence in the record and thus devoid of a factual basis, the court should grant the petitioner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter proceed in accordance with due process of law. (citation)." (Id. at p. 658, emphasis added.)

Because the overarching consideration is public safety, the test in reviewing the Board's decision denying parole "is not whether some evidence supports the reasons (the Board) cited for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." In re Barker (2007) 151 Cal. App. 4th 346, 366, original emphasis. See also, In re Lee (2006) 143 Cal. App. 4th 1400, 1408 ("some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety."); In re Tripp (2007) 150 Cal. App. 4th 306, 313 ("evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public."); In re Viray (2008) 161 Cal. App. 4th 1405 and In re Singler (2008) 2008 WL 788471, quoting Lee, supra, 143 Cal. App. 4th at p. 1409. The Federal Courts have reached the same conclusion in Hayward v. Marshall (2007) 512 F. 3d 536, 543, quoting Lee, supra, 143 Cal. App. 4th at p. 1408 and In re Elkins, 144 Cal. App. 4th 475, 499 (holding that the "governor, in reviewing a suitability determination must remain focused ... on facts indicating that release currently poses 'an unreasonable risk of danger to society'.")

Accordingly, the relevant test is not whether some

7-A

evidence supports the reasons cited for denying parole, but whether some evidence indicates that a prisoner's release unreasonably endangers public safety.

    1.  The Board based it's decision that Petitioner poses an unreasonable risk of danger to society or a threat to public safety if released from prison, in part, on the crime. "The commitment offense was, frankly, horrific. Stabbing someone 40 times, severing their coradid artery, having a six-inch gash across their face — this was horrific. This was an especially cruel and callous manner in which this was done. The victim was mutilated during this offense by 40 stab wounds. The offense was carried out in a manner which demonstrates an exceptional and callous disregard for human suffering by you inflicting these 40 stab wounds, as I've indicated before. The motive for the crime was inexplicable and very trivial in relation to the offense." (Exhibit B, BPH Transcripts Decision, p. 59, lines 20-26 — p. 60, lines 1-5)

    While the stabbing of Scott Tucker was unquestionablly violent, as most murders are, there is no evidence suggesting that the crime was more violent than minimally required to sustain a second degree murder conviction. As other courts have noted, "second degree murder is defined as the unlawful killing of a human being with malice aforethought" and all second degree murders involve same amount of viciousness or callousness to satisfy the malice requirement. In re Weider, 145 Cal. App. 4th 570, 587. In re Singler, 2008 DJDAR 4194, 4201, "the fact that Singler disposed of Gayle's body in a rural area did not make the crime so 'especially heinous, atrocious or cruel'"... "He did not attack, injure, or kill multiple victims; He did not

7-B

carry out the offense in a dispassionate and calculated manner, such as an execution-style murder; the shooting did not demonstrate an exceptionally callous disregard for human suffering; and the motive for the crime was not inexplicable or very trivial."

Criminal acts constituting any given Penal Code violation come in a broad spectrum and it is not appropriate for the Board to label a crime as "cruel," "callous," or "calculated" without providing comparative perspective. In addition, the qualifiers of "exceptionally" or "especially" are, by definition, only meant to apply to the most extreme examples. The fact that Petitioner's crime falls within the Board's own matrix of common scenarios is further proof it is not particularly "exceptional."

Here, Petitioner's crime squarely falls within California Code of Regulations, Section 2404 (c), Category C-II, which describes:

Category "C" Severe Trauma

"Death resulted from severe trauma inflicted with deadly intensity; e.g. beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the victim."

Category "II" Prior Relationship

"Victim was involved in a personal relationship with prisoner (spouse, family member, friend, etc.) which contributed to the motivation for the act resulting in death. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, see category V."

Although the Petitioner's crime is very serious, a jury of

7-C

his peers convicted him of second degree murder and not first degree murder. Petitioner's crime falls within the Board's own matrix of common scenarios.

Under the Board's regulations in CCR, Title 15, 2402 (c) (1), A thru E are five factors indicating whether a prisoner committed his offense in that manner: (A) Multiple victims were attacked, injured or killed in the same or separate incidents. (B) The offense was carried out in a dispassionate and calculated manner, such as an execution style murder. (C) The victim was abused, defiled or mutilated during or after the offense. (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

It is obvious the Board chose "B," "C," "D", and "E" as a basis for denying parole. The record is unsupported by these factors to deny parole. The use of "cruel fashion" shows no more callous disregard for human suffering than is shown by most murder offenses.

The Board also stated the crime was "trivial in relation-ship to the offense." When taking into consideration that motivations for murder which include revenge, greed, bigotry, rejection, betrayal, jealousy, respect, a desire to cover up other crimes, and rage, it cannot be said that Petitioner's sense of diminished self worth and his feelings of jealousy and betrayal, with his girlfriend leaving him for his friend, while he was still working for him, were trivial. Here, the fact is they are unfortunately all too common.

This purported reasoning to deny parole violates the

7-D

rule of the motivation for the crime. The motive for the crime must also be compared to "other instances of the same crime" and not "ordinary social norms."

The Board has violated Petitioner's basic fundamental due process right to have his hearing "duly" considered on an "individualized" basis. As it is evident from the Board's basis for a finding that Petitioner is not suitable for parole after all this time has past is not what the Legislative intended.

The Board's reliance on the gravity of the offense to justify denial of parole at Petitioner's fifth Parole Suitability Hearing, (Initial Hearing and four (4) Subsequent Hearings), based on the commitment offense, violates Petitioner's liberty interest and fundamental due process rights under the Fourteenth Amendment of the United States Constitution.

This continued reliance on unchanging factors is contrary to the rehabilitative goals espoused by the prison system and the "same evidence" standard.

It is now well settled that California prisoners have a protectable liberty interest in parole release that is clearly established by the United States Supreme Court. Hayward v. Marshall, 512 F. 3d 536 (9th Cir. 2008); Sass v. California Board of Prison Terms, 461 F. 3d 1123 (9th Cir. 2006); Biggs v. Terhune, 334 F. 3d 910 (9th Cir. 2003); McQuillian v. Duncan, 306 F. 3d 895 (9th Cir. 2002).

2.    The Board also based its decision that Petitioner poses an unreasonable risk of danger to society or a threat to public safety if released from prison on the psychological

7-E

report of Dr. Schroeder.

Again, the relevant test is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a prisoner's release unreasonably endangers public safety. The question in the present case is whether there is some evidence that Petitioner's release to parole unreasonably endangers public safety, not whether there is some evidence that Petitioner's psychological evaluation is a "bit troubling" and is not "totally supportive of release."

It is important to note, however, that Dr. Schroeder, in her psychological report, actually makes no risk assessment herself, but rather refers to the Probation Officer's Report which was written some 20 years earlier for the purpose of determining if probation was an appropriate alternative to incarceration back in 1986. It has no bearing on Petitioner's risk of danger to society or threat to public safety today.

Furthermore, Dr. Schroeder states, "Crimes of passion committed out of the blue by a person who has never been violent presents a level of unpredictability and makes predictions of future violence a risky business". "

Dr. Schroeder does, however, say that Petitioner has been disciplinary free and violence free for 20 years; that he has programed very well; and that he has worked hard, added to his professional credentials, and is capable of earning a good living in society. These statements are clearly supportive of release and in no way are evidence that Petitioner poses an unreasonable risk of danger to society or threat to public

7-F

safety.

In lue of her own assessment, Dr. Schroeder instead defers to the 2001 Mental Health Evaluation which included psychometric testing done to assess Petitioner's risk of violence.

These evaluations assess risk for violence in the outside community using (3) different psychological measures. Research supports an empirically based risk assessment method as being the most reliable and valid procedure for assessing risk for violence, and include:

The Hare Scale (PCL-R) which measures static factors associated with risk for violence which are not likely to change over time (long term risk assessment).

The History Clinical Risk-20 (HCR-20) which includes risk factors associated with violence.

The Violence Risk Appraisal Guide (VRAG) which is an actuarial measure for assessing risk.

According to the Mental Health Evaluation (8/29/01), p.p. 9-10, which Dr. Schroeder defers to, on the Hare Scale (PCL-R) which measures static risk factors not likely to change over time, I scored well within the low range of severity. This score reflects that level of psychopathy is not a significant risk factor.

On the History Clinical Risk-20 (HCR-20), which also indicated dynamic risk factors associated with violence, I scored within the low range of severity. The psychologist went on to state that my lifestyle did not reflect a criminal orientation, and that my prognosis for living in the community

7-G

is favorable.

On the Violence Risk Appraisal Guide (VARG), an actuarial measure, I scored within the low range of severity.

The clinical psychologist concluded that I have a low overall risk for future violence in the outside community. And that the extreme brutality which I displayed in killing my victim stands in direct contrast to the prosocial lifestyle that I was demonstrating while living in the community.

The findings in the Mental Health Evaluation from 2001 are supported by earlier Psychological Evaluations as well. In the Psychological Evaluation (6/30/97), p.2, the staff psychologist concluded Petitioner's potential for violence would be less than that of the average inmate. He also states that it appears the affected crime was an unusual occurrence and is not likely to reoccur.

The staff psychologist, in the Psychological Evaluation (6/28/94), pp.4-5, concluded, that it appears that the instant offense was an isolated incident of explosive anger. That Petitioner has matured emotionally and has developed significant insight into his personality over the years, and has learned to express his emotions, especially anger, without being aggressive. In a less controlled setting, such as a return to the community, Petitioner would most likely hold his present gains. Petitioner's current level of dangerousness is estimated to be less than average, and if paroled, should become a productive member of society.

It is clearly evident from the psychological

7-H

evaluations, that, Petitioner's degree of risk for future violence to the outside community has been in the low range since 1994. There is no evidence to support the board's claim that Petitioner poses a risk of danger to society based on the psychology evaluation.

In fact, the psychological evaluations are not only favorable of release, but the empirically base risk assessment method utilized in the 2001 Mental Health Evaluation as deferred to by Dr. Schroeder, are, as stated by Dr. Rueschenberg, the most reliable and valid procedure for assessing risk for violence.

3.  The Board's assertion that Petitioner poses an unreasonable risk of danger to society or a threat to public safety if released from prison based on Petitioner's detachment from the crime is not supported by "some evidence."

The Board sites this "detachment" as being the most prevalent reason for their finding. They do not make reference to anything said by Petitioner during the hearing itself. In fact, they even acknowledged Petitioner's expressed remorse. They refer instead, to a written document that Petitioner submitted to the Board concerning the circumstances tending to show unsuitability, as outlined in tit. 15, div. 2, § 2402 (c).

This document in no way expresses any detachment or lack of remorse. Petitioner's genuine remorse over his responsibility for killing Scott Tucker is well established through numerous psychological and counselor reports. It has even been acknowledged in several Board hearings, including the one now in question.

The purpose of the statements made via the document sited by the Board was to address aspects of the crime which

7 - I

previous Boards have addressed under tit. 15, div. 2, §2402(c).

For example, when addressing §2402(c)(1)(D); The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, Petitioner responded, "There is no evidence Petitioner tormented, terrorized, or injured the victim, or that he gratuitously increase or unnecessarily prolonged victim's pain and suffering. Was the crime callous? Petitioner answered, "Yes." However, are the facts of the crime some evidence that Petitioner acted with exceptionally callous disregard for the victim's suffering, or do the facts distinguish this crime from other second degree murders as exceptionally callous? Petitioner answered, "No."

In addressing §2402(c)(1)(E); The motive for the crime is inexplicable or very trivial in relation to the offense. Petitioner was trying to stress to the Board that he believes that Scott's death is anything but trivial. Motives such as rejection, betrayal and jealousy are, unfortunately, all too common.

Such statements in no way minimumize Petitioner's responsibility in the murder of Scott Tucker. Nor do they reflect a detachment to the crime. They were, as already stated, a means to address a rote area the Board routinely sites for denying parole for almost every lifer.

Refusing to agree with the Board's opinion that the crime was exceptionally callous or very trivial in no way demonstrates a detachment from the crime. And it certainly is not "some evidence" that Petitioner poses an unreasonable risk of danger or threat to public safety.

4. The Board based its decision that Petitioner poses a threat to public safety, in part, on their recommendation that Petitioner participate in self help and therapy programming.

While the Board may site the need for additional self-help and therapy programming as "some evidence" that Petitioner poses a threat to public safety, there is nothing in the record to support this assertion. Contrary to the Board's belief, there are a vast array of accomplishments (self-help/therapy, education and vocational achievements) that Petitioner has achieved and should not be required by the Board to repeat or continue. They include:

| Self-Help/Therapy | | Educational Achievements | |
|---|---|---|---|
| One-on-One Therapy | | B.A. Degree Chapman College | 1990-91 |
| (Dr. Shiela Stack) | 1986 | School of the Bible | |
| One-on-One Therapy | | (Sign Language Classes) | 1990 |
| (Dr. Gregory Dayton) | 1987 | Inmate Peer Education Program | 2000 |
| One-on-One Therapy | | Peer HIV Outreach Ed. Program | 2000 |
| (Dr. Karen Ergas) | 1988 | Cultural Sensitivity | 2002 |
| One-on-One Therapy | | Living the Eternal Way | 2002 |
| (Dr. Elizabeth Wollheim) | 1989 | Yoga Classes | 2002 |
| Rational Behavior Training | 1987 | Tai Chi Classes | 2002 |
| Anger Control | 1988 | FEMA Courses | 2004 |
| Anger Control | 1989 | Shambala Prison Outreach | 2004 |
| Process Group | 1997-2002 | Radiographic Pathology Class | |
| Living the Eternal Way | 2002 | (Scripps Memorial Hospital) | 2004 |
| Yoga Class/Instructor | 2002 | Breast Imaging | |
| Tai Chi Classes | 2002 | (Scripps Memorial Hospital) | 2004 |
| Shambala Prison Outreach | 2003-05 | Patient Care | |
| National Buddhist Outreach | 2003-06 | (National Medical Education) | 2006 |

| | | | |
|---|---|---|---|
| Healing Anger, The Ratna Foundation | 2005-06 | Trauma & Mobile Radiography | |
| Relationships/Communication | 2005 | (ESI Continuing Education) | 2006 |
| My Change Plan | 2006 | | |
| Effective Communication Program | 2006 | **Vocational Trades** | |
| Anger | 2006 | Vocational X-Ray | 1997 |
| Relationships/Communication | 2006 | Electroencephalograph Technician | 1998-2002 |
| Self-Worth | 2006 | Exercise Stress Test Tech. | 1999-2002 |
| Independent Study Program | 2006 | Infectious Disease Educator | 2000-2002 |
| Victims Awareness Program | 2006 | Engravograph Operator | 1990-1994 |
| | | Preventative & Planned | |
| | | Maintenance Coordinator | 1990-1994 |
| | | Sign Painter/Silk Screening | 1988-1989 |
| | | Weld (Prison Industries) | 2002-Present |

Stating that Petitioner needs Self-Help/Therapy as a reason for denying parole is groundless, and lacks "some evidence"- There is absolutely no factual evidence in the record to support it. Furthermore, Petitioner has met every suitability factor listed in the regulations; all his psychology evaluations are uniformly supportive; his Life Prisoner Evaluations Report was favorable in that it shows Petitioner has assured himself a successful reintegration to society; the substantive rehabilitation of Petitioner community support of family and friends all favor his release.

Against this backdrop, Petitioner's crime, which occurred over 20 years ago, was not "especially heinous, atrocious or cruel" (Cal. Code Regs., $2402 (c)(1)(C)) to undermine the evidence that his rehabilitative efforts demonstrate he no longer would be a danger to public safety if released on parole. (See Singler, supra, 2008

7-L

DJDAR at 4202; Hayward, supra, 512 F.3d at 544.)

7-M

(c) **GROUND THREE**: The Board has held Petitioner in custody for a period grossly disproportionate for the commitment offense and past any lawfully caculated release date the Board could muster.

**Supporting FACTS:** Petitioner alleges that In re Dannenberg (2005) 34 Cal. 4th 1016, recognized and prohibits an inmates retention, even for public safety reasons, beyond the constitutional maximum period of confinement. Petitioner alleges that any release date the Board can calculate as a lawful date has already past by many years, yet Petitioner remains in custody.

Petitioner alleges that he has a clearly established protected "liberty interest", under State and Federal laws, in release on parole, on his lawfully calculated release date. McQuillion v. Duncan (9th Cir. 2002) 306 F. 3d 895.

The purpose of parole is to "help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed." (Morrissey v. Brewer (1972) 408 U.S. 471, 477.) Although parolees are no

**Did you raise GROUND THREE in the California Supreme Court?**

☒ Yes ☐ No.

If yes, answer the following:

(1) Nature of proceeding (i.e., petition for review, habeas petition): Petition for Review
(2) Case number or citation: S163676
(3) Result (attach a copy of the court's opinion or order if available): Denied

longer in physical custody, they remain under the legal custody of the Department of Corrections and Rehabilitation and can be returned to prison at any time. (Pen. Code, § 3056; People v. Denne (1956) 141 Cal. App. 2d 499, 508 (parolees are permitted to serve the remainder of their term outside rather than within prison walls.) Parolees are subject to conditions that govern their residence, associates, ability to travel and other aspects of their lives. (Cal. Code Regs. § 2512-1513.)

The granting of parole is an essential part of our criminal justice system and is intended to assist those convicted of crimes to integrate into society as constructive individuals as soon as possible and alliviate the cost of maintaining them in custodial facilities. (Morrissey v. Brewer, supra, 408 U.S. at p. 477; People v. Vickers (1972) 8 Cal. 3d 451, 455, 458.) Release on parole is said to be the rule, rather than the exception (In re Smith (2003) 114 Cal. App. 4th 343, 351, citing Pen. Code § 3041, subd. (a)) and the Board is required to set a release date unless it determines that "the gravity of the current convicted offense... is such that consideration of the public safety requires a more lengthy period of incarceration..." (Pen. Code, § 3041, subd. (b).)

In the present case, the evidence does not support the Boards conclusion that Petitioner's parole poses an unreasonable risk or danger to public safety.

On May 15, 1985, Petitioner was involved in the murder of Scott Tucker. Approximately 2 weeks later, he was released on bail awaiting trial, and remained free for 9 months.

During his incarceration, Petitioner has made commendable gains in rehabilitation; has served 11 years beyond his minimum

8-A

term (at the time of his last hearing); has expressed remorse and accepted responsibility for the crime; has all favorable psychological reports; made specific and realistic parole plans; has had 20 years to reflect on his actions and is ready to reintegrate into society and serve the remainder of his sentence outside prison walls.

Other than the immutable nature of Petitioner's crime and pre-conviction history, all applicable criteria indicate he is suitable for parole. Given Petitioner's exemplary prison behavior and the evidence of his rehabilitation, the circumstances of the offense no longer have a predictive value and do not amount to some evidence to support the Board's conclusion that Petitioner is currently an unreasonable risk of danger to the public if released.

Therefore, the Board's denial of parole has resulted in a due process violation. The petition should be granted, and the Board should be ordered to set a release date.

8-B

**(d)   GROUND FOUR:**

**Supporting FACTS:**

**Did you raise GROUND FOUR in the California Supreme Court?**

☐ Yes ☐ No.

If yes, answer the following:

(1)   Nature of proceeding (i.e., petition for review, habeas petition):

(2)   Case number or citation:

(3)   Result (attach a copy of the court's opinion or order if available):

CIV 68 (Rev. Jan. 2006)

cv

23. Do you have any petition or appeal **now pending** in any court, either state or federal, pertaining to the judgment under attack?
☐ Yes  ☒ No

24. If your answer to #23 is "Yes," give the following information:

    (a) Name of Court:

    (b) Case Number:

    (c) Date action filed:

    (d) Nature of proceeding:

    (e) Name(s) of judges (if known):

    (f) Grounds raised:

    (g) Did you receive an evidentiary hearing on your petition, application or motion?
    ☐ Yes  ☐ No

25. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

    (a) At preliminary hearing . . . . . . . .
        Steven Feldman, 934 23rd St., San Diego, CA 92102

    (b) At arraignment and plea . . . . . . .
        Steven Feldman

    (c) At trial . . . . . . . . . . . . . . . . . . . . .
        Steven Feldman

    (d) At sentencing . . . . . . . . . . . . . . .
        Steven Feldman

    (e) On appeal . . . . . . . . . . . . . . . . . .
        Unknown

    (f) In any post-conviction proceeding .
        Gary Diamond
        Rich Pfeiffer, 9752 Willow Glenn Circle, Santa Ana, CA 92705

    (g) On appeal from any adverse ruling in a post-conviction proceeding:

CIV 68 (Rev. Jan. 2006)

cv

**26.** Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
☐ Yes    ☒ No

**27.** Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
☐ Yes    ☒ No

    (a)  If so, give name and location of court that imposed sentence to be served in the future:

    (b)  Give date and length of the future sentence:

    (c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
        ☐ Yes    ☐ No

**28.** Consent to Magistrate Judge Jurisdiction

    In order to insure the just, speedy and inexpensive determination of Section 2254 habeas cases filed in this district, the parties may waive their right to proceed before a district judge and consent to magistrate judge jurisdiction. Upon consent of all the parties under 28 U.S.C. § 636(c) to such jurisdiction, the magistrate judge will conduct all proceedings including the entry of final judgment. The parties are free to withhold consent without adverse substantive consequences.

    The Court encourages parties to consent to a magistrate judge as it will likely result in an earlier resolution of this matter. If you request that a district judge be designated to decide dispositive matters, a magistrate judge will nevertheless hear and decide all non-dispositive matters and will hear and issue a recommendation to the district judge as to all dispositive matters.

    You may consent to have a magistrate judge conduct any and all further proceedings in this case, including the entry of final judgment, by indicating your consent below.

Choose only one of the following:

☐ Plaintiff consents to magistrate judge jurisdiction as set forth above.

**OR**

☒ Plaintiff requests that a district judge be designated to decide dispositive matters and trial in this case.

**29.** Date you are mailing (or handing to a correctional officer) this Petition to this court:

July 7, 2008

CIV 68 (Rev. Jan. 2006)

cv

Wherefore, Petitioner prays that the Court grant Petitioner relief to which he may be entitled in this proceeding.

_____

SIGNATURE OF ATTORNEY (IF ANY)


I declare under penalty of perjury that the foregoing is true and correct.  Executed on

_____7/7/08_____          _Ronald Nichols_____

(DATE)                    SIGNATURE OF PETITIONER

Ronald Nichols                    Case Name: Ronald Nichols

D-27314                                              Petitioner

Avenal State Prison                          v.

P.O. Box 9, 530-2-05L              James Hartly, Warden, etal,

Avenal, CA   93204                        Respondent


## Declaration of Service by U.S. Mail


I, the undersigned, hereby declare under penalty of perjury
that: I am the party to the foregoing entitled action; I am over
eighteen (18) years of age. I caused to be served the Petition
for writ of Habeas Corpus by placing copies thereof in an
envelope addressed to the addressee in the included service list.

I placed the envelope with the proper postage thereon
fully prepaid, and placed it for deposit in the inmate mail depository
located at this institution, on July 7, 2008, at Avenal State
Prison, at Avenal, California.

I declare under penalty of perjury under the law of
the State of California that the foregoing is true and correct.
Executed on July 7, 2008, at Avenal State Prison, at Avenal,
California.

                    Ronald Nichols

                    Ronald Nichols

                    In pro se

Service List:

Clerk of U.S. District Court

Room 4290

880 Front Street

San Diego, CA  92101-8900

Calculation of Postconviction
Credits

EXHIBIT A

# Memorandum

Date    :           12-6-89

To    :           RONALD NICHOLS          D-27314

From   :   **Department of Corrections**

Subject :   **Recalculation of Life Terms, In re Monigold Decision**

The Supreme Court <u>In re Monigold</u> recently confirmed the Attorney General's opinion, 86-1102 denying Penal Code Section 2933 work incentive credits to prisoners serving 15 years to life and 25 years to life sentences.  However, In re Monigold also held that those prisoners <u>previously granted</u> work incentive credits, while mistakenly permitted to participate in the program, are entitled to all worktime credits earned until notified of their ineligibility.

These credits can only be earned for the purpose of reducing your MEPD.

Administrative Directive 89/48 has requested that we recalculate those inmates with the closest MEPD first. The Board of Prison Terms will hear cases in terms of this decision.

Your term has been recalculated in terms of the decision. Your new MEPD is _____11-23-95_____ . Your initial Parole Consideration Hearing, previously set for _____2-93_____ has been rescheduled to the _____10-94_____ calendar; because of this change the Documentation Hearing you were scheduled for on _____9-92_____ will still be held.

B.J. HILL, CC II
ASSISTANT CLASSIFICATION &
PAROLE REPRESENTATIVE

cc:   C-FILE
      FILE

INMATE COPY

| CDC NUMBER | ALPHA ID | NAME | | |
|---|---|---|---|---|
| D-27314 | | NICHOLS, Ronald Rand | 4/7/86 | White |

| MAX. RELEASE DATE | MIN. RELEASE DATE | MIN. ADJ. RELEASE DATE GT CR LOST/AT LARGE/BAIL | PAROLE PERI |
|---|---|---|---|
| To be Determined | MEPD: 9/28/96- | | Life |

BASE TERM __15-Life__ + ENHANCEMENTS __01-00__ = TOTAL TERM 15-Life+01yr

GOOD TIME CREDITS AVAILABLE (2931 PC) (PC __480__ BC __1438__ ) = 1918

PRE PRISON CREDITS:    CASE NO. __SD CR75164__

|  |  |
|---|---|
| 2900.5 PC | 60 |
| 1202.03 PC | |
| 2900.1 PC | |
| CRC | |
| Mental Health | |
| 4019 PC | 30 |
| 2931 PC | |
| Post Sentence | 9 |

Hearings:

DOC: 9/89
Init: 8/95

TOTAL PRE PRISON CREDITS (DAYS) __99__

REGISTRATION REQUIRED PER _____

| DATE REC'D | CO. CASE NO. | CT. | CODE & OFFENSE | TYPE WPN. | DATE OF OFFENSE | SENTE DATE |
|---|---|---|---|---|---|---|

CONTROLLING PRINCIPAL AND CONSECUTIVE (INCLUDING ENHANCEMENT) OFFENSE(S):

| 4/7/86 | SDCR75164 | 01 | P187 Murder 2nd 15-Life P12022(b) Use Ddly Wpn | Knife | 5/15/85 | 3/28/86 |
|---|---|---|---|---|---|---|

Defense Atty: Steven Feldman
Investigating Agency: San Diego Police Dept.

RECALCULATION OF MEPD FOR 15-LIFE AND 25-LIFE PRISONERS
RECEIVED PRIOR TO 5/27/87
PURSUANT TO IN RE MONIGOLD (1983) 205 CAL. APPR. 3d 1224
NO DSL TERM OR DSL TERM COMPLETED

**INMATE COPY**

A. CREDITS VESTED PER PC2934 (If offense date prior to 1-1-83)
   1. Total days served prior to waiver date (Waiver date
      – received date + postsentence credit) = ___9___
   2. Al ÷ 2 (round down) = ___4___
   3. Less credits lost per PC2932 – ___0___
   4. Credits to be vested = ___4___

B. MAXIMUM ELIGIBLE PAROLE DATE
   1. _86-04-07_ + _16-00-00_ -life = _2002-04-07_
      RECEIVED DATE    TOTAL TERM              BASE DATE
   2. Less total preconfinement credit – ___99___
   3. Less A4 OR vest 1/2 postsentence credit – ___4___
   4. MAXIMUM ELIGIBLE PAROLE DATE = _2001-12-25_

C. WORKTIME CREDIT PER PC2933/PC2934
   1. Less NET worktime credit earned from waiver/
      received date through 2/15/89 or end of DSL
      term if later – ___988___
   2. Current MEPD (cannot exceed B4) = _99-04-12_

D. GOOD TIME CREDIT PER PC2931
   1. Date credit applied through (2-15-89
      or date DSL term ends if later) – _89-02-15_
   2. Days left to serve = ___3708___
   3. Divide by 3 (round up) = ___1236___
   4. PC Balance (D3 ÷ 4) = ___309___
   5. BC Balance (D4 x 3) = ___927___

E. RECALCULATED MEPD (C2 – D3) = _95-11-33_
   1. Add credits lost for CDC 115's after D1 + PC __0__ BC __0__
   2. Subtract restorations for credit losses in E1 – PC __0__ BC __0__
   3. New PC/BC Balance PC= _309_ BC= _927_
   4. Add any 7 or 9 year MEPD CS Life term(s) + ___0___

F. ADJUSTED MEPD (E + E1 – E2 + E4) = _95-11-33_

G. INITIAL PAROLE CONSIDERATION HEARING = _10/94_
   (13 months prior to F)                  month/year

H. NEXT DOCUMENTATION HEARING   # __0__ = __0__
                                           month/year

Your Minimum Eligible Parole Date has been recalculated pursuant to In Re Monigold
and you have been granted _988_ days worktime credit from _4-7-86_ through
_2/15/89_/the end of your DSL term (circle one). Your recalculated/adjusted (circle
one) MEPD is _11-23-95_. Your initial life parole consideration hearing will be
scheduled during the month of _10/94_ /first available calendar (circle one).

_G. Abramson CCRS_                    _10-33-89_
CASE RECORDS STAFF                    DATE

_D27314_          _Nichols, Ronald R_      _CMC-East_
NUMBER            NAME                     INSTITUTION
5/89              FORM A – SIDE 1

Transcripts – Decision

NOTE: Complete BPH Transcripts
were sent to Attorney Rich Pfeiffer.
Numerous request for their return
have been ignored.
Petitioner's Counselor was only
able to provide a replacement copy
of the Decision portion of the
Transcripts.

EXHIBIT B

# IFE PRISONER HEARING DECISION FACE SHEET

| | |
|---|---|
| ] PAROLE GRANTED- (YES)<br>CDC: Do not release prisoner before<br>Governor's review. | **Records Use Only** |
| ⦗ PAROLE DENIED- (NO)  *5 years* | Parole Release Date |

|  | YR | MO | DAY |
|---|---|---|---|
| | | | |

Attach Prison Calculation Sheet

X AGREED UNSUITABLE (Attach 1001A Form) FOR: ——— 5 ——— YEAR(S)

| HEARING POSTPONED/REASON: _____

## PANEL RECOMMENDATIONS AND REQUESTS

**he Board Recommends:**

| | | |
|---|---|---|
| ] No more 115's or 128A's | ☒ Stay discipline free | ☒ Earn positive chronos |
| ] Work to reduce custody level | [ ] Learn a trade* | [ ] Get a GED* |
| ⦗ Get self-help* | ☒ Get therapy* | |

⦗ Recommend transfer to _____

Other _____

These programs are recommended if they are offered at your prison and you are eligible/able to participate.

**enal Code 3042 Notices**    ☒ Sent    Date: 6-30-06

**ommitment Offense(s)**

| 187/12022(b) | MURDER 2ND |
|---|---|
| Code(s) | Crime(s) |

| SDCR75164 | 01 |
|---|---|
| Case #(s) | Count #(s) |

| te Inmate Came to CDC<br>7-86 | Date Life Term Began<br>2-14-86 | Minimum Eligible Parole Date<br>11-23-95 |
|---|---|---|
| ] Initial Hearing | ☒ Subsequent (Hearing No.) 4 | Date of Last Hearing 5-4-04 |

| )C Representative | | |
|---|---|---|
| torney for Prisoner  ANTHONY HALL | Address | |
| A. Representative  R. SACHS | County  SAN DIEGO | |

iis form and the Board's decision at the end of the hearing is only <u>proposed</u> and NOT FINAL. It will not become al until it is reviewed.

| | | |
|---|---|---|
| air *Brenda Harris-Ritter* | Date | 08/15/06 |
| nel Member *Armando Pliego* | Date | |
| nel Member _____ | Date _____ | |

| ME | CDC# | PRISON | CALENDAR | DATE |
|---|---|---|---|---|
| CHOLS, RONALD | D27314 | ASP | 5/06 | AUGUST 15, 2006 |

PT 1001 (REV. 08/03)

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2    D E C I S I O N

3    **DEPUTY COMMISSIONER PEREZ:**  Okay, Commissioner.

4    We're on the record.

5    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

6    It is now 1:59 p.m.  Everyone who was in the room

7    previously is back in the room.  And we have the Deputy

8    District Attorney from San Diego, Mr. Sachs --

9         [Thereupon, tape ended and was turned over.]

10    **DEPUTY COMMISSIONER PEREZ:**  We're on record.

11    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank you.

12    In the matter of Ronald Nichols, the panel has reached

13    the following decision.  The panel reviewed all

14    information received from the public and relied on the

15    following circumstances in concluding that the prisoner

16    is not suitable for parole and would pose an

17    unreasonable risk of danger to society or a threat to

18    public safety if released from prison.  And I will tell

19    you right now,

20    Mr. Nichols, this is a five-year denial.  The commitment

21    offense was, frankly, horrific.  Stabbing someone 40

22    times, severing their coradid artery, having a six-inch

23    gash across their face -- this was horrific.  This was

24    an especially cruel and callous manner in which this was

25    done.  The victim was mutilated during this offense by

26    40 stab wounds.  The offense was carried out in a manner

27    **RONALD NICHOLS  D-27314  DECISION  PAGE 1  8/15/06**

1   which demonstrates an exceptional and callous disregard

2   for human suffering by you inflicting these 40 stab

3   wounds, as I've indicated before.  The motive for the

4   crime was inexplicable and very trivial in relation to

5   the offense.  These conclusions are drawn from the

6   Statement of Facts in the Appellate Opinion, Fourth

7   Appellate District, dated December 8th, 1987.

8           Quote, "Around 4:00 a.m., Reynado

9        Bungay, B-u-n-g-a-y, a passerby; and Richard

10       Desjardins, D-e-s-j-a-r-d-i-n-s, a bartender

11       at a nearby bar, heard screams and saw two

12       men struggling in front of the liquor store.

13       Bungay encountered security guard, Donald

14       Galjour, G-a-l-j-o-u-r, who had heard cries

15       for help; and the two men proceeded to the

16       liquor store where they found a body on top

17       of newspapers in the corner of the parking

18       lot.  Nichols was crouched behind a white

19       pickup truck.  He stood up, walked around the

20       truck, knelt down, and cradled the body.

21       Nichols had stab wounds -- stab wounds to his

22       left shoulder and both thighs and was

23       hysterical.  Desjardins and Bungay called the

24       police.  Tucker suffered a total of 40 knife

25       wounds, including one that completely

26       transected his right coradid artery.  The

27   **RONALD NICHOLS  D-27314  DECISION PAGE 2  8/15/06**

61

1        cause of death was multiple cutting and

2        stabbing wounds to the face, neck, chest,

3        back, abdomen, and extremities."

4        At the time of the crime, you denied doing it and,

5   in fact, indicated that you were a victim as well.  We

6   believe, this panel believes, that you have not

7   sufficiently participated in beneficial self-help or

8   therapy programs.  The psychiatric/psychological report

9   dated 12/27/05 authored by Coreen Schroeder,

10  S-c-h-r-o-e-d-e-r, Ph.D., is a little bit troubling; and

11  it's not totally supportive of release; and we find it to

12  be a little bit inconsistent and inconclusive, because at

13  page 4 she quotes you at the top of the page; and you

14  told her, quote, "I had a fight with my friend, died in

15  my arms, 40 stab wounds, one heck of an argument.  He was

16  having an affair with my girlfriend."  That was in

17  December of last year.  Clearly, if she was engaged to

18  him, she was not your girlfriend.  We find that, in our

19  judgment, to show that you're detached from this or not

20  dealing with it; and you're telling the psychologist

21  things that aren't true about it.  She goes on to say in

22  the Assessment of Dangerousness,

23        "Mr. Nichols has not received any

24        disciplinary 115s during almost 20 years of

25        incarceration.  He received only one 128(a)

26        counseling letter in 1984.  Given his

27  **RONALD NICHOLS    D-27314    DECISION PAGE 3    8/15/06**

1        disciplinary-free programming for 20 years,

2        he may have mellowed; however, his risk of

3        harm to others was at the same level prior to

4        his crime.  Crimes of passion committed out

5        of the blue by a person who has never been

6        violent presents a level of unpredictability

7        and make predictions of future violence a

8        risky business."

9        It's that that we're not willing to roll the dice

10       on, Mr. Nichols.  It's the unpredictability after such a

11       horrific crime and being apparently delusional about the

12       relationship when you were talking to the psychologist

13       just a few months ago.  The hearing panel notes that

14       responses to Penal Code Section 3042 Notices indicate

15       opposition to a finding of parole suitability,

16       specifically, the District Attorney of San Diego County.

17       Other factors bearing upon the suitability.  The most

18       prevalent thing to this panel was that although you

19       indicated remorse, the panel is absolutely stunned by

20       your detachment from this crime as evidenced by pages 1

21       through 4 of the written document that you prepared and

22       provided to this panel titled, "A General Outline,

23       Section 2402," dated July 18th, 2006.  At page 1, you

24       note the subsection 2402 determination of suitability,

25       and you basically have quoted different -- different

26       subsections.  And you note, under A, General,

27       **RONALD NICHOLS  D-27314  DECISION PAGE 4  8/15/06**

63

1              "Regardless of the length of time

2          served, a life prisoner shall be found

3          unsuitable for and denied parole if in the

4          judgment of the panel the prisoner will pose

5          an unreasonable risk of danger to society if

6          released from prison."

7          That's true.  And we do think there's an

8     unreasonable risk.  On page 2, under B at the bottom, you

9     quote,

10             "Information considered and indicate all

11         relevant reliable information available to

12         the panel shall be considered in determining

13         suitability for parole.  Such information

14         shall include the circumstances of the

15         prisoner's social history; past and present

16         mental state; past criminal history,

17         including involvement in other criminal

18         misconduct which is reliably documented; the

19         base and other commitment offenses, including

20         behavior before, during, and after the crime;

21         past and present attitude toward the crime;

22         and conditions of treatment or control,

23         including the use of special conditions under

24         which the prisoner may safely be released to

25         the community; and any other information

26         which bears on the prisoner's suitability for

27     RONALD NICHOLS  D-27314  DECISION PAGE 5   8/15/06

64

1          release.  Circumstances, which taken alone,

2          may not firmly establish unsuitability for

3          parole may contribute to a pattern which

4          results in a finding of unsuitability.  When

5          taken either alone or collectively, the

6          preponderance of evidence clearly points to a

7          finding of suitability for release."

8          Then you have C, "Circumstances tending to show

9     unsuitability"; and you've gone through these sections;

10    and after listing each one that you've quoted, you have

11    responded "Does not apply."  And we were especially

12    troubled by your response to D, which states,

13              "The offense was carried out in a manner

14          which demonstrates an exceptionally callous

15          disregard for human suffering"; and you have

16          stated, "Does not apply"; and you have

17          elaborated, quote, "There is no evidence I

18          tormented, terrorized, or injured my victim

19          or that I pertuitously [verbatim] increased

20          or unnecessarily prolonged his pain and

21          suffering.  Was the crime callous, question

22          mark, yes.  However, are the facts of the

23          crime some evidence that I acted with

24          exceptionally callous disregard for the

25          victim's suffering; or do the facts

26          distinguish this crime from other second

27    RONALD NICHOLS  D-27314  DECISION-PAGE 6  8/15/06

65

1       degree murders as exceptionally callous?"

2       And you answer, "No," exclamation point.

3       "The fact that my commitment offense falls

4       within the Board's own matrix of common

5       scenarios is further proof it is not

6       particularly, quote, 'exceptional,' end

7       quote."  I can assure you it is.  Under E,

8       "The motive for the crime is inexplicable or

9       very trivial in relation to the offense."

10      You have stated, "Again, does not apply" and

11      elaborated, quote, "The motive for the crime

12      must be compared to, quote, 'other instances

13      of the same crime,' end quote, and not,

14      quote, 'ordinary social horns,' end quote.

15      when taking into consideration that

16      motivations for murder, which include

17      revenge, greed, bigotry, rejection, betrayal,

18      jealousy, respect, a desire to cover up other

19      crimes and rage, it cannot be said that my

20      sense of diminished self-worth and my

21      feelings of jealousy and betrayal with my

22      girlfriend leaving me for a friend,

23      parenthesis, (the victim), end parenthesis,

24      while I was still working for him were

25      trivial. Here the fact is they're

26      unfortunately all too common," end quote.

27      RONALD NICHOLS, D-27314, DECISION PAGE 7, 8/15/06

66

1       This panel does not agree with you.  The panel makes

2       the following findings.  The prisoner needs therapy in

3       order to face -- and I emphasize "face" -- discuss,

4       understand, and cope with stress in a non-destructive

5       manner.  Until progress is made, the prisoner continues

6       to be unpredictable and a threat to others.  Therapy in a

7       controlled setting is needed, but motivation and

8       amenability are questionable.  Nevertheless, the prisoner

9       should be commended for remaining disciplinary free --

10      and we do commend you highly for that; you've been here

11      20 years without discipline; that's very good --

12      completing his Bachelor's degree and maintaining his

13      license as an X-ray Technician.  All of those are very

14      positive, and you are to be commended for all of them.

15      However, these positive aspects of your behavior do not

16      outweigh the factors of unsuitability.  This is a

17      multiple-year denial, and in a separate decision, the

18      hearing panel finds that it is not reasonable to expect

19      that parole would be granted at a hearing during the

20      following five years.  The specific reasons for this

21      finding are as follows.  The prisoner committed the

22      offense in an especially cruel manner.  Specifically, you

23      stabbed your friend of over 19 years; and for this

24      separate multiple-year denial, I quote from the Appellate

25      Opinion again.  This is the Fourth Appellate District,

26      the People versus Ronald Grant Nichols, December 8th;

27      RONALD NICHOLS, D-27314, DECISION PAGE 8, 8/15/06.

1    1987.

2              "Around 4:00 a.m. on the morning of May

3         15th, 1985, Reynado Bungay, a passerby, and

4         Richard Desjardins, a bartender at a nearby

5         bar, heard screams and saw two men struggling

6         in front of the liquor store.  Bungay

7         encountered security guard, Donald Galjour,

8         who heard cries for help; and the two men

9         proceeded to the liquor store where they

10        found the body on top of newspapers in the

11        corner of the parking lot.  Nichols was

12        crouched behind a white pickup truck.  He

13        stood up, walked around the truck, knelt

14        down, and cradled the body.  Nichols had stab

15        wounds to his left shoulder and both thighs

16        and was hysterical.  Desjardins and Bungay

17        called the police.  Tucker suffered a total

18        of 40 knife wounds, including one that

19        completely transected his right coradid

20        artery.  The cause of death was multiple

21        cutting and stabbing wounds to the face,

22        neck, chest, back, abdomen, and extremities.

23        Police Officer Pat Vinson pulled Nichols away

24        from the body and sat him on a nearby bench.

25        Nichols repeatedly said, 'Oh, my God.  Scott

26        is hurt.  He's been stabbed.'  Nichols told

27   **RONALD NICHOLS  D-27314  DECISION PAGE 9  8/15/06**

68

1       Vinson when he arrived at the liquor store,

2       he saw a man with scraggly hair and a beard

3       struggling with Tucker.  Nichols said he

4       tried to help Tucker, but the man stabbed him

5       and fled."

6   Regardless of what you've said in your written statement,

7   this panel believes the offense was carried out in a

8   dispassionate and calculated manner.  The victim was

9   abused and mutilated during the offense.  It's even worse

10  because he was in a position of trust with you as his

11  long-time friend.  The offense was carried out in a

12  manner which demonstrates an exceptionally callous

13  disregard for human suffering.  And I'm just stunned that

14  after all this time, and everything you sat here and

15  looked me and said today about remorse, you could write

16  that this wasn't callous.  The motive for the crime was

17  inexplicable or very trivial in relation to the offense.

18  We believe that you have not completed necessary

19  programming, which is essential to your adjustment; and

20  you need additional time to gain such programming and

21  that you need to participate sufficiently in related

22  self-help activities as we've indicated regarding our

23  trouble with your written statements.  We also believe

24  that the statements of the District Attorney and the

25  victims are appropriate, and we include them in a

26  determination of the need for a multiple-year denial due

27  RONALD NICHOLS   D-27314   DECISION PAGE 10   8/15/06

1    to the threat to public safety if you would be released.

2    Therefore, a longer period of observation and evaluation

3    is required before the Board should find that the

4    prisoner is suitable for parole.  Recommendations.  We

5    recommend that you participate in self-help and therapy

6    programming and be honest with the psych evaluator about

7    the relationships with Karen and Scott.  If you can't be

8    honest with them about it, I don't think you're being

9    honest with yourself about it; and I think that needs to

10    happen.  We are asking for another psych eval before the

11    next parole hearing, and we are asking to have the psych

12    evaluator look at whether you are completely detached

13    from the reality of this crime based on your conflicting

14    verbal and written statements regarding the seriousness

15    of the crime.  And we are also asking and recommending

16    that your current health is an important issue; and in a

17    new full evaluation, we want your violence potential in

18    the free community to be evaluated and also the need for

19    further therapy programs while you're incarcerated.  We

20    don't want to diminish the accomplishments that you have

21    made while you are here; but, like I said, we were

22    extremely troubled by your written statements; and we

23    think that that really needs to be evaluated further by a

24    psychologist and by you.  Commissioner, do you have any

25    comments?

26         DEPUTY COMMISSIONER PEREZ:  I think we've covered

27    RONALD NICHOLS D-27314 DECISION PAGE 11 8/15/06

70

1    everything.

2         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  That

3    concludes the hearing.  The time is 2:15 p.m.

4         **DEPUTY DISTRICT ATTORNEY SACHS:**  Thank you very

5    much.

6         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Good luck,

7    Mr. Nichols.

8         **INMATE NICHOLS:**  Thank you.

9                   --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED FIVE YEARS**                 DEC 1 3 2006

24    **THIS DECISION WILL BE FINAL ON:** _____

25    YOU WILL BE PROMPTLY NOTIFIED IF  PRIOR TO THAT

26    DATE  THE DECISION IS MODIFIED

27    RONALD NICHOLS  D-27314   DECISION  PAGE 12   8/15/06

71

## DECLARATION OF TRANSCRIBER

I, C.M. LOPEZ, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 70, and which recording was duly recorded at AVENAL STATE PRISON at AVENAL, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of RONALD NICHOLS, CDC NO. D-27314, on AUGUST 15, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated November 12, 2006, at Sacramento County, California.

C.M. LOPEZ
Transcriber
**VINE, MCKINNON & HALL**

Assembly Bill

# EXHIBIT C

**AB 1879** — 2 —

~~through December 31, 2003, or (2) California's super-ultra-low~~
~~emission vehicle (SULEV) standards on and after January 1, 2004,~~
~~and through December 31, 2007, for exhaust emissions, as specified,~~
~~and (3) the federal inherently low-emission vehicle (ILEV)~~
~~evaporative standard, as defined in federal regulations, regardless of~~
~~vehicle occupancy or ownership.~~

~~Existing law also authorizes local authorities, with respect to~~
~~highways under their jurisdictions, to permit exclusive or preferential~~
~~use of highway lanes for high-occupancy vehicles.~~

~~This bill would require a local authority, until January 1, 2008, if it~~
~~authorizes or permits exclusive or preferential use of highway lanes or~~
~~highway access ramps for high-occupancy vehicles, to also extend the~~
~~use of those lanes or ramps to vehicles that have been issued~~
~~distinctive decals, labels, or other identifiers because the vehicles meet~~
~~conditions specified above.~~

~~This bill would require the above-described local authorities to~~
~~suspend the high-occupancy vehicle lane access privilege during~~
~~periods of peak congestion to the above-described vehicles if a~~
~~periodic review of lane performance discloses certain factors.~~

~~This bill would declare that it is to take effect immediately as an~~
~~urgency statute.~~

Vote: ⅔-*majority*. Appropriation: no. Fiscal committee: ~~no~~ *yes*. State-mandated local program: no.

*The people of the State of California do enact as follows:*

1    SECTION 1.    The Legislature finds and declares the
2    following:
3        (a) Nearly 20 percent of California's prison population is
4    comprised of inmates with indeterminate prison terms.
5        (b) Of those, more than 5,000 have exceeded their eligible
6    parole dates, completed parole requirements, and been deemed
7    by the Board of Parole Hearing's forensic psychologists not to
8    pose an undue risk to public safety, but have been denied parole
9    by the Board at multiple hearings.
10       (c) The courts have repeatedly held both that parole is a
11   liberty interest and Section 3041 of the Penal Code requires that
12   parole shall normally be set. However, between 1995 and 2005,
13   more than 99 percent of all parole considerations were
14   ultimately denied. Every parole denial by the board and every

1    *(l) The state's goal of integrity in sentencing can be upheld*
2    *only by a parole board comprised of commissioners who are*
3    *qualified to make sound and unbiased parole decisions which*
4    *eliminate politics, arbitrariness, and waste, while still protecting*
5    *public safety.*
6      SEC. 2.  *Section 5075 of the Penal Code is amended to read:*
7      5075.  (a)  Commencing July 1, 2005, there is hereby created
8    the Board of Parole Hearings. As of July 1, 2005, any reference
9    to the Board of Prison Terms in this or any other code refers to
10   the Board of Parole Hearings. As of that date, the Board of
11   Prison Terms is abolished.
12     (b) The Governor shall appoint 17 commissioners, subject to
13   Senate confirmation, pursuant to this section. Of those 17
14   commissioners, 12 shall be appointed and trained to hear only
15   adult matters, and five shall be appointed and trained to hear only
16   juvenile matters. The terms of the commissioners shall expire as
17   follows: eight on July 1, 2007, and nine on July 1, 2008.
18   Successor commissioners shall hold office for terms of three
19   years, each term to commence on the expiration date of the
20   predecessor. Any appointment to a vacancy that occurs for any
21   reason other than expiration of the term shall be for the
22   remainder of the unexpired term. Commissioners are eligible for
23   reappointment. The selection of persons and their appointment by
24   the Governor and confirmation by the Senate shall *be from*
25   *among retired California state or federal judges, or*
26   *administrative law judges qualified pursuant to Section 11502 of*
27   *the Government Code, and shall* reflect as nearly as possible a
28   cross section of the racial, sexual, economic, and geographic
29   features of the population of the state.
30     (c) The chair of the board shall be designated by the Governor
31   periodically. The Governor may appoint an executive officer of
32   the board, subject to Senate confirmation, who shall hold office
33   at the pleasure of the Governor. The executive officer shall be the
34   administrative head of the board and shall exercise all duties and
35   functions necessary to insure that the responsibilities of the board
36   are successfully discharged. The secretary shall be the appointing
37   authority for all civil service positions of employment with the
38   board.
39     (d) Each commissioner shall participate in hearings on each
40   workday, except when it is necessary for a commissioner to

97

1    attend training, en banc hearings or full board meetings, or other
2    administrative business requiring the participation of the
3    commissioner. For purposes of this subdivision, these hearings
4    shall include parole consideration hearings, parole rescission
5    hearings, and parole progress hearings.
6    ~~SECTION 1. Section 21655.9 of the Vehicle Code is~~
7    ~~amended to read:~~
8    ~~21655.9. (a) (1) Whenever the Department of Transportation~~
9    ~~or a local authority authorizes or permits exclusive or preferential~~
10   ~~use of highway lanes or highway access ramps for~~
11   ~~high-occupancy vehicles pursuant to Section 21655.5, the use of~~
12   ~~those lanes or ramps shall also be extended to vehicles that are~~
13   ~~issued distinctive decals, labels, or other identifiers pursuant to~~
14   ~~Section 5205.5 regardless of vehicle occupancy or ownership.~~
15   ~~(2) A local authority during periods of peak congestion shall~~
16   ~~suspend for a lane the access privileges extended pursuant to~~
17   ~~paragraph (1) for those vehicles issued distinctive decals, labels,~~
18   ~~or other identifiers pursuant to Section 5205.5, if a periodic~~
19   ~~review of lane performance by that local authority discloses both~~
20   ~~of the following factors regarding the lane:~~
21   ~~(A) The lane, or a portion thereof, exceeds a level of service~~
22   ~~C, as described in subdivision (b) of Section 65089 of the~~
23   ~~Government Code.~~
24   ~~(B) The operation or projected operation of vehicles in the~~
25   ~~lane, or a portion thereof, will significantly increase congestion.~~
26   ~~(b) A person shall not drive a vehicle described in subdivision~~
27   ~~(a) of Section 5205.5 with a single occupant upon a~~
28   ~~high-occupancy vehicle lane pursuant to this section unless the~~
29   ~~decal, label, or other identifier issued pursuant to Section 5205.5~~
30   ~~is properly displayed on the vehicle, and the vehicle registration~~
31   ~~described in Section 5205.5 is with the vehicle.~~
32   ~~(c) A person shall not operate or own a vehicle displaying a~~
33   ~~decal, label, or other identifier, as described in Section 5205.5, if~~
34   ~~that decal, label, or identifier was not issued for that vehicle~~
35   ~~pursuant to Section 5205.5. A violation of this subdivision is a~~
36   ~~misdemeanor.~~
37   ~~(d) If the provisions in Section 5205.5 authorizing the~~
38   ~~department to issue decals, labels, or other identifiers to hybrid~~
39   ~~and alternative fuel vehicles are repealed, vehicles displaying~~
40   ~~those decals, labels, or other identifiers shall not access~~

1   high-occupancy vehicle lanes without meeting the occupancy
2   requirements otherwise applicable to those lanes.
3     (c) This section shall remain in effect only until January 1,
4   2008, and as of that date is repealed, unless a later enacted
5   statute, that is enacted before January 1, 2008, deletes or extends
6   that date.
7     SEC. 2.   This act is an urgency statute necessary for the
8   immediate preservation of the public peace, health, or safety
9   within the meaning of Article IV of the Constitution and shall go
10  into immediate effect. The facts constituting the necessity are:
11    In order that local authorities extend the use of exclusive or
12  preferential use of highway lanes and highway access ramps with
13  respect to highways and access ramps under their jurisdictions to
14  those motor vehicles that are issued distinctive decals, labels, or
15  identifiers at the earliest possible time, it is necessary that this act
16  take effect immediately.

O

Calculation Worksheet for
BPT Release Dates

EXHIBIT D

STATE OF CALIFORNIA
CALCULATION WORKSHEET
BPT/PBR RELEASE DATE
CDC 1897R (04/00)

DEPARTMENT OF CORRECTIONS

## CALCLATION WORKSHEET FOR BPT RELEASE DATE - INDETERMINATE TERM ONLY

This form is used to calculate the Board of Prison Terms (BPT) or Parole Board Rules (PBR) release date when the BPT finds a life prisoner suitable for parole and grants a parole date. This form is used when the court has imposed no consecutive determinate terms.

. Start Date          7-11-94

. Plus Total Period of Confinement (Years, Months)    *176*     + 176 mo
     (Line F from BPT Form 1005, or Period of Confinement from BPT Form 1014*)

. Equals Base Date        = 3-11-09

. Plus Dead Time        + ———

. Minus Preprison Credit      3023

. Equals BPT/PBR Release Date (Circle the applicable release date type)    = 11-30-00

— — — — — — — — — — — — — — — — — — — — — — — —

### Scheduling Progress Hearing

BPT/PBR Release Date (Line 6)
(Circle the applicable release date type)

Minus Date Parole Granted (Hearing Date)

Equals Days Remaining to Serve     =

). Equals Months Remaining to Serve (Divide Line 9 by 30)     =

**Refer to California Code of Regulations, Title 15, Division 2 (BPT Rules), Section 2269 to determine the month/year for the progress hearing.**

. Place on _____ Progress Hearing Calendar

PBR Calculations: Calculate Lines A through E on the BPT 1014 ("Reason for Decision" Section, "Hearing Panel Use only" column) to get the total confinement time. Do not subtract preprison credit.]

— — — — — — — — — — — — — — — — — — — — — — — — — —

| CALCULATED BY (Name and Title) *L Mariner* | | DATE 10-11-06 |
|---|---|---|
| INMATE'S NAME *L . . I n* | CDC NUMBER *1 7161092* | LOCATION *ACD* |

ATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS
ALCULATION WORKSHEET
PT/PBR RELEASE DATE
DC 1897R (04/00)

## CALCLATION WORKSHEET FOR BPT RELEASE DATE - INDETERMINATE TERM ONLY

his form is used to calculate the Board of Prison Terms (BPT) or Parole Board Rules (PBR) release date when the BPT finds
ife prisoner suitable for parole and grants a parole date. This form is used when the court has imposed no consecutive
terminate terms.

Start Date                                                                                      7-11-94

Plus Total Period of Confinement (Years, Months)                                     +      184 mo
(Line F from BPT Form 1005, or Period of Confinement from BPT Form 1014*)

Equals Base Date                                                                        =    11-11-09

Plus Dead Time                                                                          +      —

Minus Preprison Credit                                                                  -     3023

Equals BPT/PBR Release Date (Circle the applicable release date type)                  =    8-2-01

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

heduling Progress Hearing

BPT/PBR Release Date (Line 6)                                                          _____
Circle the applicable release date type)

Minus Date Parole Granted (Hearing Date)                                            - _____

Equals Days Remaining to Serve                                                       = _____

Equals Months Remaining to Serve (Divide Line 9 by 30)                               = _____

Refer to California Code of Regulations, Title 15, Division 2 (BPT Rules), Section 2269 to determine the
month/year for the progress hearing.

Place on _____ Progress Hearing Calendar

BR Calculations: Calculate Lines A through E on the BPT 1014 ("Reason for Decision" Section, "Hearing Panel Use
ly" column) to get the total confinement time. Do not subtract preprison credit.]

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

| CULATED BY (Name and Title) L. Martinez | | DATE 9-19-05 |
| ATE'S NAME P. Gual | CDC NUMBER J26693 | LOCATION ASP |

CALCULATING rPT/PBR RELEASE DATE                              EXHIBIT A

## INDETERMINATE (ISL) TERM ONLY

a.   Life Term Starts Date:                                    2-28-83

b.   Plus Total Period of Confinement (Years-Months):          13yr 7months
     (Line "F" from BPT Form 1005, or Period of Confinement from BPT Form 1014*)

c.   Equals Base Date:                                         9-28-1996

d.   Plus At-Large Time:                                       _____

e.   Minus Preconfinement Credit:                             1305

f.   Equals BPT/PBR Release Date:                             3-3-93
     (circle the applicable release date type)

Scheduling Progress Hearing

BPT/PBR Release Date (Line f):                                _____
(circle the applicable release date type)

Minus Date Parole Granted (Hearing Date):                    _____

Equals Days remaining to serve:                              _____

Divided by 30 equals months remaining to serve:              _____

**Refer to California Code of Regulations, Division 2 (BPT Rules), Section 2269 to determine the month/year for the progress hearing.**

Place on _____ Progress Hearing Calendar

(*PBR Calculations:  Calculate Lines A through E on the BPT 1014 ("Reason for Decision" Section, "Hearing Panel Use Only" Column) to get the total confinement time.  Do not subtract preconfinement credit.)

Calculated by (name/title): _____    Date: 5-18-2008

C33998            Woods, Ronnie            (l-p)
CDC Number         Inmate Name              Institution

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

CALCULATION WORKSHEET
BPT/PBR RELEASE DATE
DC 1897R (04/00)

## CALCLATION WORKSHEET FOR BPT RELEASE DATE - INDETERMINATE TERM ONLY

This form is used to calculate the Board of Prison Terms (BPT) or Parole Board Rules (PBR) release date when the BPT finds a life prisoner suitable for parole and grants a parole date. This form is used when the court has imposed no consecutive determinate terms.

Start Date      8-22-80

Plus Total Period of Confinement (Years, Months)    175mo    +   14yr 7mo
(Line F from BPT Form 1005, or Period of Confinement from BPT Form 1014*)

Equals Base Date      =   3-22-95

Plus Dead Time      +   —

Minus Preprison Credit      -   303

Equals BPT/PBR Release Date (Circle the applicable release date type)    =   5-23-94

- - - - - - - - - - - - - - - - - - - - - - - - - -

### Scheduling Progress Hearing

BPT/PBR Release Date (Line 6)      5-23-94
(Circle the applicable release date type)

Minus Date Parole Granted (Hearing Date)      -   4-7-05

Equals Days Remaining to Serve      = _____

Equals Months Remaining to Serve (Divide Line 9 by 30)      = _____

Refer to California Code of Regulations, Title 15, Division 2 (BPT Rules), Section 2269 to determine the month/year for the progress hearing.

Place on _____ Progress Hearing Calendar

*PBR Calculations: Calculate Lines A through E on the BPT 1014 ("Reason for Decision" Section, "Hearing Panel Use Only" column) to get the total confinement time. Do not subtract preprison credit.]

- - - - - - - - - - - - - - - - - - - - - - - - - -

| CALCULATED BY (Name and Title) L. Martinez | DATE 4-8-05 |
|---|---|
| INMATE'S NAME Moreno | CDC NUMBER C 20413 | LOCATION RJD |

CALCULATING BPT/PBR RELEASE DATE                                      <u>EXHIBIT A</u>

## INDETERMINATE (ISL) TERM ONLY

a.   Life Term Starts Date:                                    _9-6- 83_

b.   Plus Total Period of Confinement (Years-Months): _16-3 mo._   _13mo 1mo_
     (Line "F" from BPT Form 1005, or Period of Confinement from BPT Form 1014*)

c.   Equals Base Date:                                         _4 - 6·97_

d.   Plus At-Large Time:                                       _____

e.   Minus Preconfinement Credit:                             _1162_

f.   Equals BPT/PBR Release Date:                            _1-30-94_
     (circle the applicable release date type)

<u>Scheduling Progress Hearing</u>

BPT/PBR Release Date (Line f):                               _____
(circle the applicable release date type)

Minus Date Parole Granted (Hearing Date):                   _____

Equals Days remaining to serve:                             _____

Divided by 30 equals months remaining to serve:             _____

**Refer to California Code of Regulations, Division 2 (BPT Rules), Section 2269 to
determine the month/year for the progress hearing.**

Place on _____ Progress Hearing Calendar

(*PBR Calculations:  Calculate Lines A through E on the BPT 1014 (*Reason for Decision* Section,
Hearing Panel Use Only*-Column) to get the total confinement time.  Do not subtract preconfinement
credit.)

Calculated by (name/title):  _L. Martinez_              Date: _2-3-05_

_C-72297_              _Connelly, R_                       _ASP_
CDC Number            Inmate Name                      Institution

Mental Health Evaluation
12/27/05

EXHIBIT E-1

**AVENAL STATE PRISON**
**Life-Term Evaluation for the Board of Prison Terms**

**MENTAL HEALTH EVALUATION**

**Performed by C. Schroeder, PhD**
**Board Certified/Forensic**

## I.    Identifying Information:

Name:            Ronald Nichols
CDC#:            D27314
Age:             46              DOB: 04/08/59
Marital Status: Single
Race:            White
Sex:             Male

## II.   Developmental History:

Mr. Nichols was born in Japan where his father was stationed in the Navy. He was brought to California five months later. Both parents were present in the home, and he had the benefits of knowing both sets of grandparents. *"I lived with my mom's parents in Colorado during the summer…age 15 to 17. I fell down the stairs and stopped walking and talking. The doctor said it was because mom picked me up and carried me. She stopped, and I started walking again."* He attended regular classes in public school. Mr. Nichols was not sexually abused, *"but a strap hung in the broom closet for when I was bad…3, 4, or 5 hits, depending on what I had done. They changed to paying me a dollar for every A, fifty cents for a B, and a quarter for a C. I got at least a B in every subject, and one or two C's…4.0 in my senior year. I played soccer…lots of music…started playing guitar at age 7…lessons every week. I have a guitar here, the last one she bought for me before she died. I had a dog, rabbits, birds, an outside koi pond, and we each had a tropical fish tank."*

## III:  Education:

*"Twelve years of college…AA in music theory…two classes short of my B.A. in Religious Studies. Then I came to prison…in a college program when professors were allowed to come into prisons…History major…B.A.…minor in Psychology and Sociology. I completed Vocational X-ray…State certified X-ray Tech…EEG Tech…EST Tech…treadmill testing.*

INMATE COPY

*I was trained as a peer educator in infectious diseases…go around to all the yards…job sights…teach inmates. I still keep up my X-Ray license…need 12 units every year… continuing education through correspondence courses."*

IV:    Family History:

*"I have one brother two years older and one sister one year younger. She only lived 28 days in an incubator…premature.*

*Richard…no one knows where he is…divorced himself from the family 22/23 years ago due to the family not approving of his girlfriend. He took his family, $10,000, dad's tools, mom's silver and her fur coat, and their birth certificates.*

*Robin is deceased.*

*Dad is retired Navy…Air Conditioning and Refrigeration Specialist. He worked at least two full time jobs and sacrificed for the family in many ways. Mom died in 2001. She was a homemaker, active in the PTA, and den mother for Cub Scouts."*

V:    Psychosexual Development and Sexual Orientation:

Mr. Nichols reached puberty as a heterosexual at age 12/13, became sexually active at age 21/22, and reported having four partners. He reported no problems or behaviors outside the normal range in type or frequency this area of life.

VI:    Marital History:    He is single and has no children.

VII:    Military History:    None

VIII: Employment/Income History:

*"I had student jobs and put myself through college. I managed a Tandy Leather Company store, and worked for the San Diego Union paper as a driver. In prison, I've been a painter, glazer, then clerk in the paint shop, and a sign painter. I worked in Plant Ops…engraver…Preventive Maintenance and Plant Maintenance clerk for four years… medical library clerk…now clerk in the Welding shop…parts tracker. I have laudatory chronos for my work"*

IX:   Substance Abuse History:

*I was a social drinker at most...no AA/NA."*

X:    Psychological & Medical History:

Mr. Nichols reported that he has not required mental health treatment. Medical treatment included Motrin for his bad back. The 2001 Psychological report for the Board noted that Mr. Nichols reported a history of depressive symptoms and suicidal ideation.

XI:   Plans if Granted Release:

*"Ultimately, I would go to Colorado before my dad dies. My X-ray license is for California. I have employment letters...unsolicited...for interviews...on lists as licensed. The State has a list."*

XII:  Current Mental Status/Treatment Needs:

Mental status is clear in all areas of the exam: behavior, speech, thought content, thought processes, mood, and cognition.

DSM IV Diagnosis:

AXIS I:   V71.09 No Diagnosis or Condition
AXIS II:  301.9  Personality Disorder NOS
AXIS III: MEDICAL CONDITIONS RELEVANT TO AXES I&II: None
AXIS IV:  PSYCHOSOCIAL STRESSORS:  Incarceration
AXIS V:   GLOBAL ASSESSMENT OF FUNCTIONING, 1-100: 90

The only time during the interview when Mr. Nichol's affect brightened was when he spoke about his childhood pets.

XIII: Review of Life Crime:

On 0214/86, the jury found Mr. Nichols guilty:

PC187       2nd degree murder
PC12022(b)  use of dangerous weapon

He was sentenced to 15 years to Life. Mr. Nichols was asked to describe his crime: (The POR includes discrepancies.)

FROM :C SCHROEDERPHD                      FAX NO. :8887838458                    14 2006 01:43PM  P1

# INMATE COPY

"I had a fight with my friend…died in my arms…40 stab wounds…one heck of an argument. He was having an affair with my girlfriend… considered suicide…tried to work through it to maintain friendships. I couldn't resolve it. He fired me…started a fight…a short fight…rage. I stopped talking about my crime after the first Board hearing. The victim's family comes to all the hearings. One time, my victim's older brother forgave me, and then took it back at the following hearing. His family is committed to attend every hearing so that I will never be released."

<u>Remorse:</u>   "Not a day goes by that I don't think about Scott…defined by the last three months, but we were very close for 18 years. I couldn't ask for a better friend. I loved him more than I loved my brother…very caring, compassionate man. I can't believe how much I miss him." Mr. Nichols began to cry at this point.

## XIV:   Assessment of Dangerousness:

Mr. Nichols has not received any disciplinary 115's during almost 20 years or incarceration. He received only one 128A counseling letter in 1984 for Failure to Recall & Lockup. However, the POR noted: "Rule 414(b): The nature of the instant offense, the manner in which the defendant committed the crime, the defendant's habit of always carrying a weapon, the numerous people who state this defendant always armed himself and tended to be vindictive suggest strongly that Nichols may be a danger to others if not imprisoned." Given his disciplinary free programming for 20 years, he may have mellowed. However, his risk of harm to others was at the same level prior to his crime. Crimes of passion committed out-of-the blue by a person who has never been violent present a level of unpredictability that make predictions of future violence a risky business. Nonetheless, he has been disciplinary free and violence free for 20 years. The 2001 Mental Health Evaluation for the Board included psychometric testing done to assess his risk of violence. Mr. Nichols scores in the low-risk range.

## XV:   Clinical Observations and Recommendations:

Mr. Nichols has programmed very well. He has worked hard, added to his professional credentials, and is capable of earning a good living in society. He has laudatory chronos. There is little left to do except AA/NA as requested by the Board.

Mr. Nichols was advised to comply with this request because the self help available is universal and not limited to drugs and alcohol. There is AA, NA, Gamblers Anonymous, Overeaters Anonymous, and so on. Mr. Nichols would serve himself well by appreciating the wisdom of the Board.


_CSchroeder, PhD_                    _12-27-05_
Corinne Schroeder, PhD.                    Date
Bd. Certified/Forensic

Mental Health Evaluation
8/29/01

**EXHIBIT E-2**

MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS
OCTOBER 2001 CALENDAR
CMC-EAST

**PSYCHOSOCIAL ASSESSMENT**

IDENTIFYING INFORMATION:

Ronald Nichols is a 42-year-old, never-married, white first termer committed from San Diego County.  He is presently serving a 16-year to life sentence for Second Degree Murder W/Knife.  The index offense occurred on 5-15-85, and Mr. Nichols entered into CDC at Chino on 4-8-86.  He was transferred to CMC-E on 5-21-86.  He is a United States citizen.

Informed consent, including the limits of confidentiality, was provided. Mr. Nichols appeared to comprehend both the nature and purpose for the evaluation, and he agreed to participate in the interview.  The interview was conducted on 8-29-01, in two separate sessions lasting approximately 2 hours and 45 minutes.  Both his Central file and Unit Health Record were reviewed.

DEVELOPMENTAL HISTORY:

Mr. Nichols was born in Japan, while his father was serving in the U.S. Navy.  He reported that he was approximately five months old when his family returned to the United States.

His developmental history seems to be unremarkable.  There were no reported prenatal or perinatal concerns, and no birth complications or birth defects.  His developmental sequence appears to have been normal in both pace and sequence.  It does not appear that he manifested any significant behavioral or adjustment problems during early childhood.  He mentioned to the examiner that he had two mild concussions during his childhood, but no persisting cognitive deficits resulting from these two incidents.

In regard to his adolescent development, it does not appear that Mr. Nichols manifested any serious adjustment difficulties, in school, at home or in the community.

EDUCATION:

Mr. Nichols reported that he attended McKinley Elementary School, beginning in preschool until the 6th grade.  He attended Wilson Junior High School from grade 7 through 9, and he later graduated from Hoover High School.  Mr. Nichols stated that he received mostly A and B grades, and he did not have any problems with school attendance, suspensions or expulsions, or getting along with other students and teachers.

Mr. Nichols reported that he attended Mesa Junior College for approximately three years, receiving his A.A. degree in General Education.  He reported that his

Mental Health Evaluation
for the Board of Prison Terms - 2


primary interest at that time was music and theology.  He later attended San
Diego State University, and at the time of the index offense he was two classes
shy of receiving his Bachelor's Degree.  He reportedly maintained a grade point
average between A and B.

During his incarceration at CMC, Mr. Nichols obtained his Bachelor's Degree
through the Chapman University program.  His TABE test from 10-30-95 reflected a
12.9 GPL.  More recently, he completed three semesters of sign language, and he
is now involved in a correspondence class through FEMA, receiving training in the
use of radiation.

FAMILY HISTORY:

Mr. Nichols' mother, Dorothy, died on 1-11-01 at the age of 69.  He reported that
she had serious gastrointestinal difficulties, including a pernicious infection,
irritable bowel syndrome, and secondary diabetes.  His father, Clement Nichols,
is 70 years old and living in Colorado.  Mr. Nichols related that his father has
had two bypass surgeries, and recently recovered from a bout of pneumonia.  His
parents had been married for 47 years at the time of his mother's death.
Mr. Nichols has an older brother, Richard, who is now 44 years old, and he has
not had contact with Richard since approximately one year prior to the index
offense.

Mr. Nichols reported that there is no family history of legal problems.  However,
he mentioned that his mother had occasional problems with anxiety and depression,
for which she took medication.  There does not appear to be any other mental
health history in his family.  In regard to his family's medical history, in
addition to the medical problems suffered by both his parents, both of his
grandfathers experienced strokes.  In regard to the family history for drug and
alcohol abuse, Mr. Nichols reported that his older brother had problems with both
alcohol and drugs, and before moving out of his family's home, he took more than
$10,000-worth of his father's tools.

Although Mr. Nichols was raised in an intact family, his description of his
upbringing was somewhat bittersweet.  He explained that his father had 21-1/2
years of active service in the Navy, and during the early part of his childhood,
was frequently away at sea.  Toward the latter part of his childhood, his father
worked 7-1/2 years as a civilian employee for the Navy, and also had a second
job.  Mr. Nichols reported that his father had achieved the rank of Chief Petty
Officer.  Mr. Nichols then qualified that although "my father and mother did the
best job they could, they taught not to express emotion, especially anger."
Mr. Nichols related that while his father was away from home, sometimes up to
nine months at a time, his mother was in charge of the household.  He described
his mother as a somewhat domineering, and sometimes overbearing parent, who used

Mental Health Evaluation
for the Board of Prison Terms - 3


guilt and shame as a means of controlling behavior.  He informed the examiner
that although he received occasional spankings, there was no physical abuse in
his family, and no episodes of domestic violence between his parents.  However,
he described his mother's methods of parenting as being on the verge of emotional
abuse.  He described his father's role in discipline as "being dressed up front
and center, and being confronted with what we had done wrong...then we went back
to being 'Norman Rockwell' again."  Mr. Nichols related that despite these family
problems, he has memories of happy occasions within his family when there was a
feeling of closeness.

Mr. Nichols stated that since his mother was an only child and his father had
little contact with his family of origin, he had very limited extended family
relationships.  He reported that up until his mother's death, some of his family
members had no knowledge that he was incarcerated in prison for murder.  Since
his mother's death, he has re-established contact with some family members, with
the assistance of his father.  He maintains close contact with his father, by
phone and by mail, and he is hopeful that when his father's health condition
improves, he will again receive family visits.  Mr. Nichols reported that he also
has contact with several close friends in the San Diego area, and close friends
of his family.

PSYCHOSEXUAL DEVELOPMENT:

Mr. Nichols reported that he entered into puberty at about the age of 12 or 13.
He identified himself as exclusively heterosexual, and his first full sexual
experience was at the age of 22 with a girlfriend.  He reported that he has had
sex with four different women during his life, all within the context of
relationships.  He denied any interest in aggressive sex or other nonnormative
sexual behaviors or fantasies.

MARITAL/RELATIONSHIP HISTORY:

Mr. Nichols has never been married, and he has not had any live-in relationships
with women.  His first long-term romantic involvement was with Cheryl Henning.
This relationship lasted approximately 2-1/2 years, and at one point he and
Cheryl were engaged to be married.  He reported that he broke off the engagement
when there lives appeared to be moving in different directions, and he was
concerned that perhaps he and Cheryl were beginning to repeat the same patterns
that their parents had manifested in their marriages.  Mr. Nichols related that
during this time period, he was no longer interested in becoming a minister, and
he was beginning to develop "more universal religious ideas."

His second relationship was with Caryn Adkins.  Mr. Nichols informed the examiner
that his relationship with Caryn started approximately one year before the index

Mental Health Evaluation
for the Board of Prison Terms - 4

offense.  However, his record indicates that they may have been romantically involved beginning in October of 1983.  Mr. Nichols stated that he had asked Caryn to marry him, and he gave her an engagement ring.  He explained that although they were not formally engaged, Caryn accepted the ring and occasionally wore it.  It is noteworthy that Caryn and the victim in the index offense, Scott Tucker, had become romantically involved several months prior to the index offense, and at the time of the crime they were formally engaged.  Mr. Nichols informed the examiner that he now realizes he had "an overly dependent" relationship with Caryn.

After the index offense, Mr. Nichols was out on bail for approximately nine months.  During this time period, he had two dating relationships, with Loretta lasting approximately three months, and Jackie lasting approximately four months.  Mr. Nichols has not fathered any children.

MILITARY HISTORY:

Mr. Nichols has not been in military service.

EMPLOYMENT HISTORY:

Mr. Nichols reported that beginning at age 13, he started working as a paper boy for approximately two years.  At the age of 15, while he was living with his grandparents in Colorado, he had a summer job working for the Park's Department. He continued with this summertime employment for three consecutive years, and at the age of 17 he was advanced to the position of crew foreman.

Mr. Nichols related that he had a number of part-time jobs while he was attending college.  The reader is referred to the San Diego POR for more detailed information regarding his employment history.

Mr. Nichols reported that for approximately seven to eight months, he worked as a store manager for the Tandy Leather Shop in Torrance, California.  During this time period, he continued a long distant relationship with his girlfriend, Caryn, and eventually he quit this job, and returned to San Diego to work for his long-time friend, Scott Tucker. He reported that he and Scott had been childhood friends since about the age of five.  The record indicates that Mr. Tucker had recently taken over a distributorship for the San Diego Union Tribune, and he hired Mr. Nichols as one of his drivers.  At the time of the index offense, Mr. Nichols had been working for Mr. Tucker for approximately four to five months.  During the nine months he was out on bail, Mr. Nichols did odd jobs for the Cinderella Carriage Company.

During his incarceration, Mr. Nichols has held a number of job assignments, and he has consistently received good to excellent ratings from his supervisors.  He has completed certification as an x-ray technician, and he also has skills as an

Mental Health Evaluation
for the Board of Prison Terms - 5


EEG technician and exercise stress test (treadmill) technician.  He is also a peer educator for infectious diseases.

While in prison, Mr. Nichols has also worked in the paint shop and as an engraver.  His current career interests are in the area of medical services, especially medical imaging.

SUBSTANCE ABUSE:

Mr. Nichols described himself as a social drinker who had only minor interest in alcohol.  He informed the examiner that at the age of 14 he experimented very briefly with marijuana.  He does not appear to have a substance use disorder, or a need for substance abuse treatment.

Mr. Nichols expressed that he has an interest in Native American culture, and for approximately three months while he was at CMC, he attended meetings with the White Bison Group, which follows the 12-Step model.  Mr. Nichols then stated that at one point he was a traditional Native American dancer, an interest which he developed prior to his incarceration in prison.

MENTAL HEALTH HISTORY:

Although Mr. Nichols does not have a mental health history in the community preceding the index offense, he informed the examiner that he now recognizes that he suffered from childhood depression, and that he occasionally had suicidal thoughts.  He reported that his problems with depression seemed to remit during adolescence, and it was not until several months prior to the index offense, he suffered a relapse of depressive symptoms.  During the several months that preceded the index offense, when Caryn became romantically involved with the victim, Mr. Nichols stated that he became suicidal.  He related that when he first found out about Caryn's involvement with the victim, he drove toward the Anza Borrego Desert, contemplating suicide.  Later, when he discovered that Caryn and the victim were formally engaged, he went to the Sunset Cliffs area of San Diego and contemplated suicide.  He stated that after he realized that he had stabbed Mr. Tucker to death, he again became suicidal, and inflicted knife wounds on both his leg and his lower shoulder.  He expressed that after he realized he had killed the victim, he had a desire to end his life, but was unable to continue stabbing himself.  After his arrest, while he was housed in county jail, he was placed in four-point restraints for approximately three days, and he was on suicide watch.  He reported that he was in the psychiatric ward at San Diego Jail for approximately two weeks for observation and evaluation.  He was not treated with psychotropic medication.

Mental Health Evaluation
for the Board of Prison Terms - 6

While out on bail, he was referred by his defense attorney to Dr. Gail Cooper, a
psychotherapist in the San Diego area.  He attended psychotherapy sessions with
Dr. Cooper for approximately eight months, but he was not treated with
medication.  The record indicates that prior to his trial, he was evaluated by
several independent examiners.  He stated that he was diagnosed with Passive-
Aggressive and Explosive Personality Disorders.

Following his entry into CDC, on 4-30-86 he was recommended for a Category "J"
psychiatric evaluation.  However, there was no diagnosis on Axis I, and following
his arrival at CMC, on 5-28-86, he was cleared for placement in General
Population (GP).  Diagnostic impression was Mixed Personality Disorder.  Although
Mr. Nichols has not been a patient in the mental health services program during
his incarceration in prison, he had four years of individual therapy with
psychology interns, and he has participated in numerous therapy groups.
Currently, he is continuing his participation in Dr. Tolchin's Process Group, of
which he has been a member for the last four years.  He articulated that his
participation in therapy at CMC has helped him to better comprehend both himself
and the contributing factors to the index offense.

There did not appear to be any serious medical problems.

PLANS IF GRANTED RELEASE:

Currently, Mr. Nichols plans to parole to the San Diego area where he has living
arrangements with Mark and Mary Erdrich.  He expressed confidence in his ability
to find and maintain employment, and he has made contact with several job
opportunities in the San Diego area.  He acknowledged that he will have some
difficulty adjusting to life in the outside community, but he expressed
confidence in his ability to comply with his conditions for parole.

He is hopeful that eventually he will be able to move to Colorado, where he can
be closer to his father.  His long-term plans include working in the medical
field, and completing his Master's Degree in some area of health care.  He also
expressed an interest in financial planning.

## CLINICAL ASSESSMENT

CURRENT MENTAL STATUS/TREATMENT NEEDS:

Mr. Nichols arrived for the interview neatly groomed and dressed, displaying good
personal hygiene.  His presentation and behavior were within normal limits.  His
demeanor was mild-mannered, sincere and cooperative.  He was alert and well-
oriented in the three spheres.  His speech was normal, and his responses were
well articulated.  He described his mood as "pretty good" and affect was broad
and appropriate.  He did not endorse any primary symptoms of depression or
hypomania.  His thinking was well-integrated and purposeful without unusual

Mental Health Evaluation
for the Board of Prison Terms - 7


preoccupations.  Abstract reasoning on Proverbs and Similarities was good.
Memory and concentration appeared to be intact.  General fund of knowledge was
adequate.  He denied any unusual perceptual experiences, "Except within the
spiritual context."  Both judgment and insight appeared to be adequate.  He
denied any thoughts or intentions of harm to self or others.

DIAGNOSTIC IMPRESSION:

AXIS I:     V71.09    NO DIAGNOSIS ON AXIS I.
AXIS II:    301.9     PERSONALITY DISORDER NOS.
AXIS III:   NONE.
AXIS IV:    INCARCERATION.
AXIS V:     GLOBAL ASSESSMENT OF FUNCTIONING (GAF) = 80.

At the present time, Mr. Nichols does not appear to be manifesting any signs or
symptoms of a mental disorder, and he does not appear to be in need of mental
health treatment.

REVIEW OF LIFE CRIME:

The index offense is Mr. Nichols' only conviction.  The reader is referred to the
San Diego POR, and the Life Prisoner Evaluations from November 1994 and October
1994, for comprehensive descriptions of his index offense.

Briefly stated, in the early morning hours of 5-15-85, Mr. Nichols fatally
stabbed his friend and employer, 25-year-old Scott Tucker, with a knife.  The
record indicates that there were approximately 40 stab wounds on the face, neck,
chest, back and extremities of the victim.  Mr. Tucker was found lying face down,
having bled profusely from his face and neck.  In addition to the various stab
wounds, his neck had been slashed.  At the time the victim was discovered by the
arresting officers, he was not breathing and there was no pulse.  During the
offense, Mr. Nichols sustained self-inflicted wounds to his thigh and his upper
left shoulder.  In general, the previous accounts of this offense indicate that
Mr. Nichols was having extreme difficulty accepting the end of his relationship
with his former girlfriend, Caryn, and he stabbed the victim to death in a fit of
jealous rage.

According to the record, after he realized he had seriously injured the victim
and he was dying, Mr. Nichols attempted to stop the bleeding by applying pressure
to the wounds.  After he realized that the victim was dead, he wounded himself
with the knife, and then laid on top of the victim, holding him.  According to
the POR, Mr. Nichols wrapped the knife in a bandanna and threw it on top of the
roof of a nearby structure.  Initially, he denied responsibility for the offense,
claiming that Mr. Tucker had been attacked by another individual.  However, after

Mental Health Evaluation
for the Board of Prison Terms - 8

several hours of questioning, he recanted and acknowledged committing the
offense. He expressed disbelief that he had actually killed the victim, or was
capable of killing anyone. In the present interview, when discussing the above
offense, Mr. Nichols acknowledged that he was feeling extremely distraught at the
time the crime occurred, and he was having difficulty accepting the end of his
relationship with Caryn. He attributed part of his difficulty in handling this
situation to his having a dependent relationship with Caryn, and his having not
learned how to express anger, or other negative emotions, while living in his
family. He informed the examiner that he had learned how to handle his anger in
interpersonal relationships in a passive-aggressive way, without directly
expressing his anger verbally, but instead "occasionally blowing up."

Mr. Nichols divulged that he had no intention of killing the victim. However, he
admitted that there was tension in their relationship and he felt that Mr. Tucker
was "dismissing" him. He expressed that he felt "dismissed as an employee and a
friend, too." He stated that several minutes before he killed Mr. Tucker, they
had argued, apparently the first time there was any open hostility between the
two, and Mr. Tucker fired him, stating that he would have another driver deliver
his newspapers. Mr. Nichols expressed that he had "four pillars of support in my
life--my family, Scott, Caryn and work...that morning three of the four pillar
were wiped out in one shot." He claimed that when Mr. Tucker fired him, he
pointed his finger on his chest and "pushed me with his finger." He also stated
that, in regard to the victim's relationship with his former girlfriend, he told
him to "fucking get over it." Mr. Nichols reported that he then felt extreme
anger toward the victim, and he stated, "This ain't right, dude," and then "I
pushed him...he got up and he lunged at me and I pulled out a small knife I had
in my pocket that I used for work to cut bundles." Mr. Nichols contended that
initially, he had no intention of killing Mr. Tucker, but as they struggled with
one another, he increasingly became angry with the victim, and eventually "all
hell broke loose...all the anger and rage that I felt inside poured out."
Mr. Nichols stated that the level of violence he exhibited toward the victim was
incomprehensible, and for a long period of time he was in denial regarding the
severity of his violence, and the extent of harm that he had done to the victim.
He reported that for a long time he was unable to recall certain aspects of the
offense, but stated he now "recalls the whole fight." He added, "Brutal is the
only way I can describe it...it's hard to believe I could have actually stabbed
anyone 40 times."

Mr. Nichols acknowledged that he continued to stab the victim after he no longer
posed a potential threat. He also acknowledged that the victim's behavior was
most likely in self-defense, and not aggressive.

Although the record indicates that there was some consideration given to the
possibility that Mr. Nichols' actions were premeditated, he informed the examiner

Mental Health Evaluation
for the Board of Prison Terms - 9


that he acted totally on impulse.  He stated that he discarded the murder weapon, both to cover up the offense and to stop from hurting himself.  He reported that he initially denied responsibility for the offense because he did not want to face his mother and father or the victim's parents with what he had done.  He said, "I was still partly in denial."

During the interview, Mr. Nichols informed the examiner that he has learned to deal with his feelings in a much more open and expressive way, and he no longer is involved in dependent interpersonal relationships, stating "I feel okay being alone now."  He stated that after he entered into prison his strongest concern was realizing how he was capable of murder and "how I could keep anything like this from happening again."  According to the POR, Mr. Nichols had a history of explosive anger, and he had regularly carried a knife on his person.

RISK FOR VIOLENCE:

Risk for future violence in the outside community was estimated using three different psychological measures.  The current research supports an empirically based risk assessment method as being the most reliable and valid procedure for assessing risk for violence.

On the Hare Scale (PCL-R), Mr. Nichols scored well within the low range of severity.  This score reflects that level of psychopathy is not a significant risk factor.  The PCL-R measures static risk factors associated with risk for violence which are not likely to change over time.

On the History Clinical Risk-20 (HCR-20), which also includes dynamic risk factors associated with violence, Mr. Nichols also scored within the low range of severity.  As illustrated above, he does not have problems with mental illness, his lifestyle did not reflect a criminal orientation, and his prognosis for living in the community is favorable.

On the Violence Risk Appraisal Guide (VRAG), an actuarial measure, Mr. Nichols also scored within the low range of severity.

CONCLUSION:

Overall, Mr. Nichols seems to have a low overall risk for future violence in the outside community.  The extreme brutality which Mr. Nichols displayed in killing the victim stands in direct contrast to the prosocial lifestyle that he was demonstrating while living in the community.  During his incarceration, there have been no episodes of violence, and he seems to have been able to avoid the major explosive outbursts which occurred prior to the index offense.  At the time of the crime, it appears that Mr. Nichols was an immature, young man, having

Mental Health Evaluation
for the Board of Prison Terms - 10


limited self-awareness, problems with dependency in relationships, and being emotionally constricted. During his incarceration, Mr. Nichols has availed himself of numerous programming opportunities, upgrading himself educationally and vocationally, and participating in self-improvement activities. Whereas before, he seemed to have some difficulty in establishing a direction and purpose in his life, he now seems to have more self-awareness, a higher level of maturity, and a well-established sense of direction in his life.


ERICH RUESCHENBERG, Ph.D.
Clinical Psychologist


D:R: 8-29/T: 8-30-01

Psychological Evaluation
6/30/97

EXHIBIT E-3

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
NOVEMBER 1997 CALENDAR
CMC-EAST

IDENTIFICATION/FORENSIC DATA:  This is the fourth psychological
                              evaluation for the Board of Prison
Terms concerning Ronald Nichols, a 38-year-old male who entered the
Department of Corrections on 4-8-86 to serve a 16-to-life sentence for
Murder, 2nd Degree.

SOURCES OF INFORMATION:  Mr. Nichols was interviewed on 6-30-97
                         following a review of his C-file and Unit
Health Record.

MENTAL STATUS EXAMINATION:  Mr. Nichols arrived as scheduled for
                            this interview.  He was well groomed,
polite, and willing to expand on issues without prompting.  His speech
was clear and direct, and there was no indication of any confusion or
cognitive deficits of any type.  His affect was appropriate to the
content of the narrative and there were no mood expressions which
would indicate any level of dysfunctioning.

DIAGNOSTIC IMPRESSION:

Axis II:  PERSONALITY DISORDER,NOS, WITH PASSIVE-AGGRESSIVE,
          EXPLOSIVE, and AVOIDANT ELEMENTS, BY HISTORY, RESOLVING.

INTERVIEW/DISCUSSION:  Mr. Nichols was asked to discuss some of
                       his earlier experiences in the home which might
help to explain some of his motivations leading up to the crime.  Mr.
Nichols recalled that his parents taught him that the outward
expression of negative feelings would not be tolerated in the home.
Whenever angry or negative emotion erupted, which was somewhat common
during a period of sibling rivalry with his brother, Mr. Nichols
remembers being forced to display behavior which was contradictory to
his feelings.  For example, instead of investigating why there was a
conflict and to resolve the emotional repercussions in the moment, Mr.
Nichols' parents would simply force him to shake hands or display
positive behavior without dealing with his real feelings.  The inmate
felt that he could not express his feelings openly, but only in a more
passive and direct manner.  The inmate also tended to isolate himself
from others and did contemplate suicide several times.  He recalls
that his mother was strong and domineering, personality factors which
encouraged the inmate to assume a more passive and compliant
presentation, in spite of harboring a variety of negative feelings.
Three months prior to the crime, Mr. Nichols learned that his fiancee
began dating his boss and longtime friend.  According to the inmate,
his fiancee and friend remained friendly toward the inmate as all
three individuals worked through various feelings with regard to each
other.  During the three months, Mr. Nichols appeared unwilling to
confront his boss or his fiancee regarding his feelings and to come to
some clarification in the relationship.  The first serious
conversation with the victim concerning their changing relationships
resulted in the crime.  Mr. Nichols acknowledged his passive

NICHOLS, Ronald     D-27314    CMC-E    Psychiatric    6-30-97    1 of

Psychological Evaluation
for the Board of Prison Terms
Page 2

aggressive behavior on the job and his hurt feelings prior to speaking
with the victim about his feelings.  An argument ensued and the victim
fired Mr. Nichols on the spot from his job.  Feelings turned openly
ugly and Mr. Nichols responded by accusing the victim of depriving him
of his fiancee and now his job.  Some pushing and shoving began and
Mr. Nichols pulled a three and a half-inch pocket knife, and stabbed
the victim 40 times with sufficient strength to cause an exit wound.
The inmate admitted suffering partial amnesia, and he remains unclear
to day about the stabbing of the victim.

Mr. Nichols was asked how he is different today from the way he
behaved at the time of the crime.  He says that from various self-help
groups, he has learned to distinguish the difference between anger and
aggression.  At one point, earlier in his life, he believed that the
expression of angry feelings was similar to aggressive behavior and
should be avoided at all costs.  He has also obtained insight into the
pattern of behavior which he sought out in his relationships with
women.  He learned at an early age to adopt a "nice guy" image as a way
of avoiding negative feeling and obtaining personal acceptance.  Thus,
he would avoid issues in which he had to take an unpopular stand and
he would express what anger he did have in passive and indirect ways
so as to avoid any fault-finding by his partner.  When under extreme
stress, such as losing both his fiancee and his job, his rage surfaced
quickly and was expressed without thoughts to the consequences.  The
inmate seems to have some understanding of these dynamics and has been
able to trace much of his behavior to early learned patterns of
relating while in the home.

<u>CONCLUSION</u>:  It would appear from the available information that Mr.
               Nichols is not habitually, criminally oriented.  In
addition, there is no history of serious drug or alcohol abuse nor any
such known patterns from his early homelife.  Mental illness does not
appear to be part of the inmate's effort to adapt.  Early learning
from his parents regarding relationships does not appear to be
particularly positive.  In spite of the difficulties, Mr. Nichols
attempted to establish satisfying relationships with other women prior
to the crime.  The inmate did express remorse in a spontaneous way.
Given the inmate's insights since his period of incarceration, it
would appear that the affective crime was an unusual occurrence and is
not likely to reoccur.  The insight that he has gained from previous
therapy and his own efforts at self-understanding would appear to be
maintained should he be released to the community.  It is expected
that his potential for violence would be less than that of the average
inmate.

L.W. Berning, Ph.D.
Staff Psychologist

t:7-1-97

NICHOLS, Ronald      D-27314    CMC-E    Psychiatric

Psychological Evaluation
6/28/94

EXHIBIT E-4

*Inmate*
*4/25 Y*

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
OCTOBER 1994 CALENDAR
CMC-EAST

IDENTIFICATION/FORENSIC DATA:  This is the second Psychological
Evaluation for the Board of Prison Terms concerning Ronald Nichols, a
35-year-old, white, first-termer who entered CDC on 4/8/86 and
arrived at CMC/E on 5/21/86.  He was sentenced to a 16-year-to-life
for Second-Degree Murder with the Use of a Dangerous Weapon (Knife).
He was approximately 25 years old at the time the offense was
committed and has served approximately 9 years in prison.  Most all
of his term has been served at CMC/E.  He has no known juvenile crime
history.

SOURCES OF INFORMATION:  This evaluation is based on thorough reviews
of the Central File and the medical health record, and a single
structured, 80-minute clinical interview conducted on 6/15/94.  The
details of the commitment offense have been thoroughly presented in
the inmate's Central File, and these details will not be repeated
here.

INSTANT OFFENSE:  S's version of the offense does not differ from the
factual information contained in the official report and in the prior
Board report.  S's girlfriend fell in love with S's best friend who
was also his boss and they planned to get married.  For a period of 3
months prior to the crime, the 3 individuals tried to maintain their
friendship which was extremely stressful for S.  The victim and S had
an argument which escalated into a shoving match.  S drew a knife.
The struggle that ensued ended with the victim sustaining 40 stab
wounds.  S then stabbed himself in the chest and the leg and threw
the knife away and held the victim in his arms until the police
arrived.  Initially, S said that a third person had perpetrated the
attack.  A short time after his arrest, he admitted guilt and tried
to kill himself.  Neither drugs or alcohol were involved in the crime
or have ever been a problem for S.

BRIEF BACKGROUND INFORMATION:  S grew up in the San Diego area in an
intact family and has one brother.  His father was a Chief Petty
Officer in the US Navy and retired after 30 years.  S said, "I became
my mother's son and was closer to her and my brother became my
father's son.  There was always conflict between me and my brother
trying to get attention from our father."

PSYCHOPATHOLOGY:  S has a history of suicide attempts from the age of
7.  Reportedly, there were 3 suicide attempts in the 3-month period
prior to the instant offense.  S also attempted suicide after his
arrest.  He was designated a Category J upon entering CMC/E because
of depression and suicidal ideation.  However, S progressively
improved over the years, through treatment, and subsequently became a
general population inmate.

PRESENT PROGRAMMING:  S works in Plant Operations.  He is a skilled
engravograph operator and a preventative maintenance clerk.  He has

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
PAGE 2

held this job for 4 years and is considered an "essential worker."
He has received exceptional work supervisor reports and 2 laudatory
chronos commending him on his work.  He earned his BA from Chapman
College.  He has taken advantage of all therapy available to him
since his incarceration.  He has completed 4 years of one-on-one
psychotherapy on a weekly basis with psychology interns.  S is part
American Indian and is very active at the sweat lodge.  He is a
council member for B Quad and "Firekeeper."  It appears that he
received only one CDC-115, on 5/10/94, for not responding to a
locked-down order.  He said that he and others inmates are in the
process of appealing that particular CDC-115.  S explained the
incident in the following manner:  He said there was a locked-down
called when he and other members of the sweat lodge were actually
inside the sweat lodge in the middle of a spiritual ceremony totally
unaware that a locked-down was called.  S maintained that the members
participating in the ceremony were not notified and did not know
about the locked-down.  Since that episode, new safeguards have been
put in place at the sweat lodge to avoid repetition of this type of
incident (please refer to Life Prisoner's Evaluation Progress Report,
dated 6/9/92 for more detailed information on programming).

MENTAL STATUS EXAMINATION:  S came to the interview neatly groomed
and dressed.  He presented as mild-mannered, pleasant, and polite.
He was clear, coherent, and oriented.  There were no disturbances of
thought, affect or behavior.  His concentration, attention and memory
were all intact.  In general, there was no evidence of mental
illness.

DIAGNOSTIC IMPRESSION:
AXIS    I:      NO DIAGNOSIS OR CONDITION.
AXIS    II:     PERSONALITY DISORDER, NOS WITH IMMATURE, DEPENDENT,
                HISTRIONIC AND PASSIVE/AGGRESSIVE FEATURES, BY
                HISTORY, VERY MUCH IMPROVED.

INTERVIEW:  During the interview, S frankly discussed his current
insights into the crime, his state of mind at the time he committed
the crime and his present insight and understanding.

With respect to remorse:  S displayed what appeared to be genuine
remorse and openly wept as he seemed to re-experience the enormity of
his offense and his own loss, he said,

        All my relationships throughout my life were high maintenance
        ones, except for my relationship with Scott.  I mean that I
        usually gave 60% and received 40%, especially with my women
        friends.  But with Scott it was different, it was always 50-50.
        There isn't a time I don't think of him and miss him.  If it
        happened to somebody else, Scott would have been standing up for
        me . . . I watched my best friend die knowing that I had done it
        to him . . . I killed the best friend I ever knew . . . I am

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
PAGE 3

> responsible for taking his life away from him . . . I am
> responsible for breaking up all of our families. I hurt Scott's
> mom and dad and my mom and dad. That is as bad as it gets,
> taking the life of your best friend.

<u>Current insight into crime:</u> At the time of the instant offense, S
was distraught over losing his girlfriend. He was trying desperately
to hold it all together and not also lose his best friend. He was
not capable of leaving Scott or his exgirlfriend. He had love/hate
feelings and did not know how to handle his feelings. He said:

> I was brought up in a home where feelings were suppressed. I
> was told not to get angry. I was unable to reconcile the
> feelings I felt toward Scott and the pressure built up. I
> became more and more difficult to be with. I became hostile and
> made snide remarks and behaved in a passive/aggressive manner
> toward Scott. I loved my friend Scott so how could I be angry
> at him? I had 4 important pillars in my life at that time: My
> family, my job, my girlfriend and my best friend, Scott. When
> Scott fired me, we fought. I pulled my knife. We struggled
> over the knife and Scott stabbed me in the leg. I saw Scott's
> assertiveness as an attack on me. All the anger I felt and
> never expressed openly came out of me and I exploded. I should
> have walked away from it, but at the time I couldn't say good-
> bye to things. I was weak.

S talked about what appeared to be his struggle with himself after he
committed the crime. He indicated that part of him wanted to runaway
and another part of him could not leave his friend. He said, "I
stabbed myself in the other leg to make myself stay so I wouldn't run
away. I couldn't leave my best friend and I didn't want to live. I
then stabbed myself in the chest."

S indicated that when he was unsuccessful in killing himself, he went
back and cradled his friend in his arms again and wept. He said, "at
first I was able to convince myself that I wasn't responsible and
later when I realized the full impact of what I had done, I truly
wanted to die."

S evidenced that he knew what passive/aggressive meant. He said:

> Now I know how to deal with my anger openly without getting
> aggressive. I am able to cry. I can experience my pain. I am
> in touch with my emotions at many levels and it feels great. I
> was never able to openly experience my feelings and I can do
> that now. I know how to deal with relationships.

S proceeded to give substantial examples of events that happened to
him while in prison where he evidenced mature and insightful
understanding of himself now compared to how he was in the past, and

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
PAGE 4

his present method of dealing with his emotions.  He talked about how
he broke up with a girlfriend while he was incarcerated.  He said
that he believed his relationship with her was not good for them
both.  He mentioned that he was able to discuss his feelings openly
and directly with his girlfriend and was able to end the relationship
without animosity.  He talked about getting angry with friends while
incarcerated and not becoming aggressive.  Something he could never
have done in the past.  He convincingly demonstrated the new insights
he has learned and incorporated into himself.  S indicated that one
of the most important lessons of his life was learned while taking
angry control therapy.  During that class, S understood that there
was a difference between anger and aggression.  He said, "this is the
most important, life saving lesson I learned.  I have learned that I
can be angry without being aggressive.  I can now express my anger."

In retrospect, S said, "I would have killed someone else or myself
eventually.  Prison saved my life.  My biggest regret is that it had
to come at such a high cost.  Is it fair to Scott's family that I
should live after killing Scott?  No, it isn't.  But I won't let
Scott's death be wasted.  It can stand for me being a better person.
One who Scott can be proud of."

SUMMARY:  S has no major mental illness and no mental illness is
related to the commitment offense, either directly or indirectly.
However, his emotional immaturity, his poor self esteem, and his
inability to express his genuine emotions, mainly anger, in a mature
manner, contributed to the crime.  S has made considerable changes in
his behavior.  He is no longer the fragile individual he was at the
time of the instant offense.  It appears that S no longer suppresses
his emotions and is more accepting of himself.  He has availed
himself of what seems to be every opportunity offered at CDC for
growth and change and has made considerable progress.  His work in
therapy has contributed to his insights into the crime and his
greater self-understanding and acceptance.

CONCLUSIONS AND RECOMMENDATIONS:  It appears that S has matured
emotionally and has developed significant insight into his
personality over the years.  He seems to have learned to express his
emotions, especially his anger, without being aggressive.  He has
found some measure of inner strength in his spiritual practices.  S
has no history of violence prior to the crime, and he has exhibited
no violent behavior while in prison.  It appears that the instant
offense was an isolated incident of explosive anger.

In a less controlled setting, such as return to the community, S
would most likely hold his present gains.  His current level of
dangerousness, as compared to that of other incarcerated felons at

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PRISON TERMS
PAGE 5

CMC, is estimated to be less than average.  If he is paroled, he
should become a productive member of society.  If he is not paroled,
he should maintain his present programming and continue his personal
growth.

SHIRLEY STACK, Ph.D.
STAFF PSYCHOLOGIST

AMY PHENIX, Ph.D.
STAFF PSYCHOLOGIST

Suitability Document
Tit 15, Div. 2, § 2402

EXHIBIT F

RONALD NICHOLS   D-27314

BOARD OF PAROLE HEARINGS
FOURTH SUBSEQUENT PAROLE SUITABILITY HEARING

CALIFORNIA CODE OF REGULATIONS
Title 15, Crime Prevention and Corrections
Division 2, Board of Prison Terms

Subsection 2402. **Determination of Suitability**

(a) **General.** The panel shall first determine whether the life prisoner
is suitable for release on parole. Regardless of the length of time
served, a life prisoner shall be found unsuitable for and denied parole
if in the judgment of the panel the prisoner will pose an unreasonable
risk of danger to society if released from prison.

There is no evidence to support that public safety requires a lengthier
period of incarceration, as supported by (12) years of Mental Health
Evaluations.

These evaluations assess **Risk for Violence** in the outside community
using (3) different psychological measures. Research supports an
empirically based risk assessment method as being the most reliable
and valid procedure for assessing risk for violence, and include:

The **Hare Scale** (PCL-R) which measures static risk factors associated
with risk for violence which are not likely to change over time (**long-
term risk assessment**);

The **History Clinical Risk-20** (HCR-20) which includes risk factors
associated with violence;

The **Violence Risk Appraisal Guide** (VRAG) which is an actuarial measure
for assessing risk.

The Mental Health Evaluations have consistantly listed my degree of
risk for future violence to the outside community as low since 1994.
(BPH Rules 2270 requires the BPH to consider these reports)

Mental Health Evaluation (12/27/05), p.4: "he (Nichols) has been dis-
ciplinary free and violence free for 20 years. The 2001 Mental Health
Evaluation for the Board included psychometric testing done to assess
his risk of violence. Mr. Nichols scores in the **low-risk range**. Dr.
Schroeder goes on to say; Mr. Nichols has programmed very well. He
has worked hard, added to his professional credentials, and is capable
of earning a good living in society.
Dr. Schroeder does quote from the 1986 POR, saying, "Nichols may be a
danger to others if not imprisoned." It must be noted that this is **not**
a **risk assessment** by Dr. Schroeder, but is merely the Probation Officer's
recommendation to the Judge for imprisonment as opposed to probation.
Dr. Schroeder, in fact, makes no independent assessment of risk, stating
instead that the unpredictability of my commitment offense makes pre-
dictions of future violence a risky business. In lue of her own assess-
ment, she insteed defers to the previous MHE's findings scoring me in
the low-risk range.

<u>Mental Health Evaluation (8/29/01), pp. 9-10:</u>  On the **Hare Scale** (PCL-R), which measures static risk factors associated with risk for violence which are not likely to change over time, I scored **well within the low range of severity.**  This score reflects that level of psychopathy is not a significant risk factor.

On the **History Clinical Risk-20** (HCR-20), which also includes dynamic risk factors associated with violence, I also scored within the **low range of severity.**  The Psychologist went on to state that my lifestyle did not reflect a criminal orientation, and that **my prognosis for living in the community is favorable.**

On the **Violence Risk Appraisal Guide** (VARG), an actuarial measure, I also scored within the **low range of severity.**

The Clinical Psychologist concluded that I have a **low overall risk for future violence in the outside community.**  And that the extreme brutality which I displayed in killing my victim stands in direct contrast to the prosocial lifestyle that I was demonstrating while living in the community.

<u>Psychological Evaluation (6/30/97), p. 2:</u>  The Staff Psychologist concluded that **my potential for violence would be less than that of the average inmate.**  He also stated that it appears **the affective crime was an unusual occurrence and is not likely to reoccur.**  That I am not habitually, criminally oriented, and have no history of serious drug or alcohol abuse.  And that the insight that I have gained from previous therapy and my own efforts at self-understanding would be maintained should I be released.

<u>Psychological Evaluation (6/28/94), pp. 4-5:</u>  **The Staff Psychologist concluded that it appears that the instant offense was an isolated incident** of explosive anger.  That I have matured emotionally and have developed significant insight into my personality over the years.  And that I have learned to express my emotions, especially my anger, without being aggressive.  In a less controlled setting, such as a return to the community, I would most likely hold my present gains.  That my current level of dangerousness is estimated to be less than average. And if paroled, I should become a productive member of society.

**(b) Information Considered.**  All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during, and after the crime; past and present attitude toward the crime; and conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to

the community; and any other information which bears on the prisoner's suitability for release.  Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

**When taken either alone, or collectively, the perponderance of evidence clearly points to a finding of suitability for release.**

(c) **Circumstances Tending to Show Unsuitability.** The following cir-cumstances each tend to indicate unsuitability for release.  These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a par-ticular case is left to the judgment of the panel.  Circumstances tend-ing to indicate unsuitability include:

(1) **Commitment Offense.**  The prisoner commited the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered in-clude:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

   **Does Not Apply**

(B) The offense was carried out in a dispassionate and calculated man-ner, such as an execution-style murder.

   **Does Not Apply**

(C) The victim was abused, defiled or mutilated during or after the offense.

   **Does Not Apply**

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

   **Does Not Apply**

There is no evidence I tormented, terrorized, or injured my victim, or that I gratuitously increased or unnecessarily prolonged his pain and suffering.  Was the crime callous?  Yes.  However, are the facts of the crime some evidence that I acted with exceptionally callous disregard for the victim's suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No!

The fact that my commitment offense falls within the Board's own matrix of common scenarios is further proff it is not particularly "exceptional."

CCR 3375.2 (a) (7) (A) list the exclusions for housing at a Level II facility. CSR and CDCR have twice reviewed my case factors and have determined that I do **not** have "Unusual Violence" in my case factors, thereby, making me suitable for Level II housing. This means that the Department of Corrections and Rehabilitation has deemed my commitment offense to be no more egregious than any other second degree murder.

**(E)** The motive for the crime is inexplicable or very trivial in relation to the offense.

    **Does Not Apply**

The motive for the crime must be compared to "other instances of the same crime" and not "ordinary social norms." When taking into consideration that motivations for murder which include revenge, greed, bigotry, rejection, betrayal, jealousy, respect, a desire to cover up other crimes, and rage, it cannot be said that my sense of diminished self-worth and my feelings of jealousy and betrayal, with my girlfriend leaving me for a frined (the victim), while I was still working for him, were trivial. Here, the fact is they are unfortunately all too common.

Life Prisoner Evaluation (7/23/97), p.7: Mitigating Factors; (a) The inmate participated in the crime under somewhat understandable circumstances... The defendant perceives that the victim, as being the defendant's friend, while representing himself, proceeded to steel his girlfriend and ruin his ability to continue employment with his current firm, while we do not believe the defendant's perception is correct, this factor obviously did provoke him.

**(2) Previous Record of Violence..** The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

    **Does Not Apply**

Life Prisoner Evaluation (1/04), p. 9: Preconviction Factors: (A) Juvenile Record: None. (B) Adult Convictions and Arrests: The prisoner had never been arrested prior to the commitment offense.

I was, however, questioned by police in 1983 concerning a mutual combatant altercation where I defended myself against an attacker who threatened me with a "bowling ball" sized rock. I used a bullwhip in my defense. The other person sustained no injuries. And no charges were filed. The incident occurred when I was (24) years old. It did not occur at an early age.

**(3) Unstable Social History.** The prisoner has a history of unstable or tumultuous relationships with others.

    **Does Not Apply**

(4) **Sadistic Sexual Offense.**   The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

   Does Not Apply.

(5) **Psychological Factors.**   The prisoner has a lengthy history of severe mental problems related to the offense.

   Does Not Apply

Psychology Evaluation (6/28/94), p. 4:   Subject has no major mental illness and no mental illness is related to the commitment offense, either directly or indirectly.

Although I was under significant stress for a (3) month period prior to the commitment offense, this does not constitute a "lengthy history" of severe mental problems.   (See Mental Health Evaluation (8/29/01), p. 7):  "At the present, Mr. Nichols does not appear to be manifesting any signs or symptoms of a mental disorder, and he does not appear to be in need of mental health treatment."

(6) **Institutional Behavior.**   The prisoner has engaged in serious misconduct in prison or jail.

   Does Not Apply

I received (1) 128A Counseling Chrono on 5/10/94.   However, Counseling Chronos document "minor misconduct" only and entails no discipline, and therefore, do not reflect serious misconduct.   (CCR 3000, 3312 (a); and In re Smith)

(d) **Circumstances Tending to Show Suitability.**   The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.   Circumstances tending to indicate suitability include:

(1) **No Juvenile Record.**   The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

   Does Apply

I have no juvenile history.   (Life Prisoner Evaluation (1/04), p. 9: Juvenile Record: None.)

(2) **Stable Social History.**  The prisoner has experienced reasonably
stable relationships with others.

    **Does Apply**

I have maintained a number of long term relationships with family and
friends.  Especially my father, C. R. Nichols; Mary and Mark Erdrich;
and Barbar (Skov) Savage.

Each of these relationships continually submit Letters of Support for
my parole consideration hearings, as well as offer their complete
support when I am paroled.

(3) **Signs of Remorse.**  The prisoner performed acts which tend to indicate
the presence of remorse, such as attempting to repair the damage,
seeking help for or relieving suffering of the victim, **or** indicating
that he **understands the nature and magnitude of the offense.**

    **Does Apply**

The BPT panel acknowledged my remorse at my 2002 hearing:  "**We can see
that you're remorseful.**  We read your letter and, you know, have read
the things that you've written before and we can see you're remorseful."
(2002 BPT Hearing transcripts, p. 56, lines 10-13)

Additionally, numerous Psychological and Counselor reports have docu-
mented my feelings of remorse, as well as my understanding the nature
and magnitude of my offense.

Mental Health Evaluation (8/29/01), p. 3: "(Nichols) appears to have
matured emotionally, learning to express his emotions, especially anger,
without being aggressive.  **His remorse seems genuine.**"

Life Prisoner Evaluation (10/01), p. 3:  "Probably the most important
discovery is his (Nichols') insight into the crime, the how and the
why he could kill his best friend... **His remorse seems genuine.**"

Psychological Evaluation (6/30/97), p. 2: "(Nichols) did **express
remorse in a spontaneous way.**  Given the inmate's insight since his
period of incarceration, it would appear that the affective crime was
an unusual occurrence and is not likely to reoccur."

Psychology Evaluation (6/28/94), p.2: "(Nichols displayed what appears
to be **genuine remorse** and openly wept as he seemed to re-experience
the enormity of his offense."

Psychology Evaluation (6/30/89), p. 2:  "(Nichols) **expressed deep, and
seemingly genuine regret** over the taking of the life of his closest
friend."

Psychiatric Chrono (12/15/89): "An area in which (Nichols) has shown significant progress is that of becoming more able to experience events in his life on an emotional rather than on a strictly intellectual level... this is essential in order to understand the dynamics of his crime and to come to a position of handling emotionally laden situations in a healthier manner."

Psychological Chrono (8/26/88): "Mr. Nichols has begun to understand that early life interactions within his family have led to over-controlled and suppressed hostility, finding vent in violent outburst such as that which brought him to prison. Understanding and, more importantly, experiencing emotionally the nature of these early-life interactions have been the task of much of therapy."

Psychiatric Chrono (7/20/88): "(Nichols) completed a psychotherapy group in Anger Control. This group was based on principles of Cognitive Behavior Modification and included self-management strategies for regulating physical, cognitive, emotional and behavior components to anger."

Psychiatric Chrono (7/87): "(Nichols) completed a Rational Behavior Training Group, based on the theories of Cognitive Behavior Modification. He learned self-management and self-counseling strategies for controlling and replacing negative self-defeating emotions. He learned techniques for changing his thoughts, attitudes and beliefs so that he may eliminate irrational cognitions."

**(4) Motive for Crime.** The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

**Does Apply**

My crime was committed as the result of significant stress, as supported by the following:

Mental Health Evaluation (8/29/01), p. 5: "Several months prior to the index offense, he (Nichols) suffered a relapse of depressive symptoms. During the several months that preceded the index offense... Mr. Nichols stated that he became suicidal... After his arrest, while he was housed in County jail, he was placed in four-point restraints for approximately three days, and he was on suicide watch... he was in the psychiatric ward at San Diego Jail approximately two weeks for observation and evaluation... The record indicates that prior to his trial, he was evaluated by several independent examiners... When discussing the offense, Mr. Nichols acknowledged that he was feeling extremely **distraught** at the time    the crime occured, and he was having difficulty accepting the end of his relationship with Caryn."

Psychology Evaluation (6/30/97), p. 2: "When under **extreme stress,**

7.

such as losing both his fiance and his job, his rage surfaced quickly
and was expressed without thought to the consequences."

Psychological Evaluation (6/28/94), p. 3:  "At the time of the instant
offense, (Nichols) was distraught over losing his girlfriend."

(5) Battered Woman Syndrome.  At the time of the commission of the
crime, the prisoner suffered from Battered Woman Syndrome, as defined
in section 2000 (b), and it appears the criminal behavior was the
result of that victimization.

     Does Not Apply

(6) Lack of Criminal History.  The prisoner lacks any significant
history of violent crime.

     Does Apply

Life Prisoner Evaluation (1/04), p. 9:  "The prisoner had never been
arrested prior to the commitment offense.  The prisoner was not on
parole at the time of the commitment offense."

As previously stated under (c)(2), I was questioned in 1983 by police
about an incident concerning mutual combat.  No injuries were sustained
by either parties.  No charges were ever filed.  And I was not arrested.

Notedly, a single isolated incident does not constitute a significant
history.

(7) Age.  The prisoner's present age reduces the probability of
recidivism.

     Does Apply

I am currently (47) years old.

(8) Understanding and Plans for Future.  The prisoner has made realistic
plans for release or has developed marketable skills that can be put
to use upon release.

     Does Apply

I have developed a number of marketable skills that can be put to use
upon release, including:

| | |
|---|---|
| Vocational X-Ray (State Certified X-Ray Technologist) | 1994-1997 |
| Electroencephalograph Technician | 1998-2002 |
| Exercise Stress Test Technician | 1999-2002 |
| Infectious Disease Educator | 2000-2002 |
| Engravograph Operator | 1990-1994 |

| | |
|---|---|
| Preventative & Planned Maintenance Coordinator | 1990-1994 |
| Sign Painter/Silk Screening | 1988-1989 |
| Welder (Prison Industry) | 2002-Present |

## Employment Opportunities:

I have received several unsolicited job offers for my skills as an X-Ray Technologist from Quality Medical Professionals, a Medical Staffing Network Company, offering me employment opportunities with earnings up to $32 per hour, or $5,200 per month.

Additional evidence of my Understanding and Plans for Future are:

Life Prisoner Evaluation (10/01), pp. 3-4:  "(Nichols) would leave prison with salable skills and has realistic and attainable goals for the future."

Education Progress Report (11/7/97):  "(Nichols) can apply for entry level work in the Medical X-Ray field... and it is hopeful that he can use these skills someday in gainful employment."

Life Prisoner Evaluation (7/23/97), p. 10:  "(Nichols) has programmed in a positive manner and has salable work skills."

Letter to BPT - Engraving (5/23/94):  "The expertise Mr. Nichols has developed in the engraving filed and skills associated with engraving... will allow him to attain gainful employment upon release."

Letter of Reference - Welding (4/20/04):  "Given the opportunity, Mr. Nichols would do very well with any employer seeking a team player with the skills and capabilities to get the job done."

## Parole Plans - Residence:

The victim's family have formally requested I not be paroled  to the San Diego area (the County of last legal residence) at my 2002 BPT Hearing (Hearing Transcripts pp. 50-51), in accordance with Penal Code 3003 (f).

My first request for residence, therefore, is for an out of state parole to Grand Junction, Colorado, under Penal Code 3003 (b) (4), (f), and (j), to live with and care for my aging father.  This request is supported by previous Life Prisoner Evaluations and numerous Letters of Support.

If, however, the Board requires I parole to San Diego, California, under Penal Code 3003 (a), I plan to reside with Mark and Mary Erdrich during my transition back into society, as supported by Letters of Support.

**Education:**

I plan to continue to upgrade educationally in my chosen filed of
X-Ray through Continuing Education Courses.  I will also seek enroll-
ment to Touro University International College of Health Science.

I have taken my Graduate Record Examinations (GRE) in preperation for
graduate school, with a score of 1360.

(9) **Institutional Behavior.**  Institutional activities indicate an
enhanced ability to function within the law upon release.

  **Does Apply**

I have been a model prisoner during my entire incarceration of (20)
plus years, and have taken advantage of the rehabilitative programs
available to me.

I have been disciplinary free during my entire incarceration.

I received a BA degree from Chapman University, and made the Honor
Role.  I have also taken classes in Sign Language with a GPA of
4.0.

I have taken Vocational Trades, and their equivalent in (8) different
fields of study, including vocational X-Ray; with a concentration of
study in the medical field in (4) different departments, including:
Radiology, Neurology, Cardiology, and Infectious Control.

I continue to upgrade my education and awareness in these fields, and
have completed the following courses:

    Radiographic Pathology, (Scripps Memorial Hospital), 2004
    Breast Imaging, (Scripps Memorial Hospital), 2004
    Hazardous Materials for Medical Personnel, (FEMA), 2005
    Patient Care, (National Medical Education), 2006
    Trauma and Mobile Radiography, (ESI Continuing Education, Inc.), 2006

Additional educational achievements are:

    Inmate Peer Education Program, 2000
    HIV Prevention Training, (Planned Parenthood Department of Education)
      HIV Outreach Education, 2000
    Cultural Sensitivity, (Planned Parenthood Department of Education), 2002
    Living the Eternal Way, (Center for Spiritual Enlightenment), 2002
    Yoga Classes, 2002
    Tai Chi Classes, 2002
    FEMA Courses, (Emergency Preparedness), 2004
    Shambala Prison Outreach Program, (The Myth of Freedom), 2005

I helped develop and teach a Yoga program as part of a Recreational Therapy Group for EOP and CCCMS inmates that are part of the Mental Health system within CDCR.

I routinuely receive Above Average to Excellent Supervisor Work Reports.

I participated in the following self-help and therapy programs:

| | |
|---|---|
| One-on-One Therapy (Dr. Sheila Stack) | 1986 |
| One-on-One Therapy (Dr. Gregory Dayton) | 1987 |
| One-on-One Therapy (Dr. Karen Ergas) | 1988 |
| One-on-One Therapy (Dr. Elizabeth Wolheim) | 1989 |
| Rational Behavior Training | 1987 |
| Anger Control | 1988 |
| Anger Control | 1989 |
| Process Group | 1997-2002 |
| Living the Eternal Way | 2002 |
| Yoga Class Instructor | 2002 |
| Tai Chi Classes | 2002 |
| Shambala Prison Outreach Program | 2003-2004 |
| National Buddhist Outreach Program | 2003-2004 |
| The Ratna Foundation, Healing Anger | 2005-Present |
| Relationships/Communication | 2005 |
| My Change Plan | 2006 |
| Effective Communication Program | 2006 |
| Anger | 2006 |
| Relationships/Communication | 2006 |
| Self-Worth | 2006 |
| Independent Study Program | 2006 |
| Victims Awareness Program | 2006 |

I am currently participating in a correspondence program through the Ratna Foundation, entitled, "The Power of Patience: Healing Anger," in an attempt to further continue my self-understanding; in addition to my continued participation in Golden Hills Adult School Independent Study Project of self-help/therapy, which is offered here at Avenal State Prison.

My C-file contains numerous chronos and Memorandums commending my behavior.

The BPT in my 2004 Hearing made the following recommendations of my Institutional Behavior:

    Stay disciplinary free
    Upgrade educationally/vocationally
    Get involved in self-help/therapy programs as they are available

I have complied with each and every recommendation of the Board, in that:

I have remained disciplinary free.

I continued to upgrade my education/vocational training by taking
courses in the following:

        Radiographic Pathology (Scripps Memorial Hospital)          6/28/04
        Breast Imaging (Scripps Memorial Hospital)                  7/28/04
        Patient Care (National Medical Education)                   3/29/06
        Trauma & Mobile Radiography (ESI Continuing Education, Inc.)

I have continued working in the Prison Industries Welding Department
in order to upgrade and perfect my skills as a welder.

I completed the following self-help/therapy programs:

        Relationship/Communication              12/22/05
        My Change Plan                          01/24/06
        Effective Communication Program         02/08/06
        Anger                                   02/21/06
        Relationship/Communication              02/28/06
        Self-Worth                              03/22/06
        Independent Study Program               05/16/06
        Victims Awareness Program               06/05/06

California Supreme Court
Petition for Review

EXHIBIT G

# S163676

Ronald Nichols
D-27314
P.O. Box 9, 530-2-05L
Avenal, CA    93204

FILED WITH PERMISSION

SUPREME COURT
FILED

MAY 20 2008

Frederick K. Ohlrich Clerk

_____

Deputy

IN THE SUPREME COURT

OF THE STATE OF CALIFORNIA

In re,                          )    Case No.
                                )
                                )    (Superior Court No. HC17957   CR75164)
                                )    (Appellate Court No. D052412)
                                )
        RONALD NICHOLS          )    PETITION FOR REVIEW TO EXHAUST
                                )    STATE REMEDIES.
                                )
On Petition For Review.         )    Cal. Rules of Court, R 33.3

PETITION FOR REVIEW

TO EXHAUST STATE REMEDIES

1

## I.

This case presents no grounds for review under Rule 28 (b) and this petition is filed solely to exhaust state remedies for Federal habeas corpus purposes.

## II.

### Statement of Underlying Proceedings

Petitioner is a so-called "life" prisoner, serving a term of 15 years to life, plus a one year enhancement, for a conviction of second degree murder over 22 years ago. He has appeared before, and been denied parole by the Board of Parole Hearings, five times since 1994.

Petitioner challenges the Boards policy and procedures as being a violation of his Protected Liberty Interest and Due Process rights, protectable under both State and Federal constitutional provisions.

Petitioner alleges, among other things, that but for the Board's violation of his rights complained of, he would have been released to parole long ago.

On August 15, 2006, Petitioner appeared before the Board for his fifth parole consideration hearing where the Board once again denied parole.

On December 13, 2006, the Boards decision became final without modification by the Decision Review Unit, or review by the Governor.

On November 18, 2007, Petitioner filed a petition for writ of habeas corpus in the San Diego Superior Court, challenging the Board's automatic and arbitrary denial of his due process rights, which was subsequently denied on January 16, 2008.

1    On January 24, 2008, Petitioner forwarded a petition for writ

2 of habeas corpus to the Court of Appeals—Fourth Appellate District,

3 Division One. On   May 8, 2008      the petition was denied.

4                              III.

5              The Factual and Legal Basis

6                 of Petitioner's Claims

7                   (Brief Explanation)

8     The factual and legal basis of Petitioner's claims include

9 allegations that he is being held in custody for a period grossly

10 disproportionate to his individual culpability for the commitment

11 offense and past any lawfully calculated release date the Board

12 could muster, in violation of Due Process Clause of both State and

13 Federal Constitutions. Petitioner alleges that In re Dannenberg

14 (2005) 34 Cal.4th 1016, recognized and prohibits an inmates

15 retention, even for public safety reasons, beyond the constitutional

16 maximum period of confinement. Petitioner alleges that any

17 release date the Board can calculate as a lawful release date has

18 already past by many years, yet Petitioner remains in custody.

19     Petitioner alleges that he has a clearly established

20 protected "liberty interest", under State and Federal Law, in

21 release on parole, on his lawfully calculated release date.

22 McQuillion v. Duncan (9th Cir. 2002) 306 F.3d 895.

23     Petitioner alleges that the Board's conclusion, for the

24 fifth consecutive time, that Petitioner is "not suitable for

25 parole and would pose an unreasonable risk of danger to society

26 or threat to public safety if released from prison" is unsupported

27 by any evidence in the record and must be reversed. In re

28 Rosenkrants (2000) 80 Cal.App.4th 409; In re Scott (I) 2004

                              3

119 Cal.App.4th 871; In re Ramirez (2001) 94 Cal.App.4th 549; In re Shaputis (2005) 135 Cal.App.4th 217.

Petitioner alleges that the Board's decision failed to make the required findings based on the enumerated criteria and is unsupported by "some evidence."

Petitioner alleges that a continuing reliance on the commitment offense has violated due process under Biggs v. Terhune (9the Cir. 2003) 334 F.3d 910.

Petitioner alleges that before he can be denied his post-conviction credits, he is entitled to the minimum procedural due process provisions outlined by the United States Supreme Court in Wolff v. McDonnell, 418 U.S. 539 (1974) and Superintendent v Hill, 472, U.S. 445 (1985).

Petitioner alleges that the Board's decision was arbitrary and capricious, not individualized due consideration, and instead based on a general policy of denying parole without truly examining the merits of the case.

Petitioner relies on all arguments and authorities raised in his petition to the Superior and Appellate Courts, and all additional arguments fairly contained therein.

Petitioner requests that this Court pass on any review of this case so he may promptly raise his claims in Federal Courts.

DATED: May 14, 2008          RESPECTFULLY SUBMITTED,

Ronald Nichols
Petitioner, In pro se

4

PROOF OF SERVICE BY UNITED STATES MAIL

STATE OF CALIFORNIA
COUNTY OF Kings                    NICHOLS    v.    HARTLEY

CASE NO._____
Appellate Court No. D052412

I, the undersigned, declare that I am a resident of this County, State of California. I am over the age of eighteen and a party to the within action. My address is:
Ronald Nichols
D-27314
P.O. Box 9, 530-2-05L
Avenal, CA    93204

On the below stated date, I served the documents described as follows:

PETITION FOR REVIEW TO EXHAUST STATE REMEDIES

On the interested parties in this action by placing a true copy therefore, enclosed in a sealed exelope with postage prepaid, in the United States Mail in the County, California, addressed as follows:

California Supreme Court
350 McAllister Street
San Francisco, CA  94102

I DECLARE UNDER PENLTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATED: May 14, 2008           SIGNED: _Ronald Nichols_____
                                       Ronald Nichols

California Supreme Court
Denial

EXHIBIT H

Court of Appeal, Fourth Appellate District, Div. 1 - No. D052412
**S163676**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re RONALD NICHOLS on Habeas Corpus

The petition for review is denied.

George, C.J. and Corrigan, J., were absent and did not participate.

SUPREME COURT
FILED

JUN 2 5 2008

Frederick K. Ohlrich Clerk

Deputy

CHIN
Acting Chief Justice

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

DEFENDANTS

**FILING FEE PAID**
Yes    No

**IFP MOTION FILED**
Yes    No

**COPIES SENT TO**

Court    Pro Se

**FILED**
JUL 1 0 2008
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                    DEPUTY

Ronald Nichols

Hartley, et al

**(b) COUNTY OF RESIDENCE OF FIRST LISTED   Kings
PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

**Ronald Nichols**
**PO Box 9**
**Avenal, CA 93204**
**D-27314**

ATTORNEYS (IF KNOWN)

**'08 CV 1241 DMS RBB**

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX
(For Diversity Cases Only)     FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

## 28 U.S.C. 2254

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury - Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment &Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☒ 530 General | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ Security Act | | ☐ 950 Constitutionality of State |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding  ☐ 2 Removal from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23    DEMAND $    Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):**    JUDGE    Docket Number

DATE    7/10/2008    SIGNATURE OF ATTORNEY OF RECORD
*R. Nelley*

CR